561 P.2d 925

**STATE of New Mexico, Plaintiff-Appellee,**

v.

**Frank BLOOM and Ralph Mikorey, Defendants-Appellants.**

Nos. 2121; 2122.

Court of Appeals of New Mexico.

March 16, 1976.

Toney Anaya, Atty. Gen., Ralph W. Muxlow, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

Dahl L. Harris, Rosenberg & Harris, Albuquerque, for defendants-appellants.

## OPINION

HENDLEY, Judge.

Bloom was convicted of possession of marijuana contrary to § 54–11–23(B)(3), N.M.S.A.1953 (Repl. Vol. 8, pt. 2, 1962, Supp.1975), aggravated assault upon a police officer contrary to § 40A–22–21(1), N.M.S.A.1953 (2d Repl. Vol. 6, 1972) and escape from the custody of a peace officer contrary to § 40A–22–10, N.M.S.A.1953 (2d Repl. Vol. 6, 1972). Mikorey was convicted of the same count of possession of marijuana and escape from custody charges, and also of battery upon a peace officer contrary to § 40A–22–23, N.M.S.A.1953 (2d Repl. Vol. 6, 1972). Both defendants appeal asserting: (1) the trial court erred in refusing to suppress the marijuana seized because the seizure was a result of an illegal stop, arrest and seizure; (2) the police officer was not in the lawful discharge of his duties when he arrested the defendant; and (3) the marijuana conviction should be reversed for failure of the state to disclose pursuant to Rule 27 of the R.Cr.P.

### Motion to Suppress

Defendants' motion to suppress was on the grounds that the "stop, search, seizure, and arrest was made without the necessary probable cause." The following testimony is taken from the motion to suppress hearing and is taken solely from Patrolman Williams' testimony. We set forth the testimony as reported as any attempted summary would be unfair. At approximately 3:00 p.m. on January 27, 1975 Patrolman

Williams, New Mexico State Police was conducting a road block checking driver's licenses and registration certificates.

Direct examination of Williams by the state.

"Q   Okay, now, would you tell us what you were set up or instructed, or what you were actually doing out there in making the checks, how you conducted the checks, and so on.  You stated you were looking for driver's license, stolen cars, marijuana, all of it, but what were you actually doing then in looking for these things, the next car that came?

"A   That's what I was looking for.

"Q   Okay.  All right, lets take the next car that you said you checked.  What did you do with reference to that car?

"A   Driver's license-registration, like I said.  I don't remember what car it was or who it was or—I don't even think I searched it, but I might have.  I don't know, I mean searching, open the trunk and look in it, I don't call that searching.

"Q   Okay, have you ever opened anyone's trunk and looked in their trunk without asking their consent?

"A   No, sir.

"Q   Or at least whether it's a valid search or not, that you felt there was reason to make such a search?

"A   No, sir.

"   .     .     .

"A   I would have no reason to search it if I didn't think I had a valid reason.

"   .     .     .

"Q   Then with reference to that car that you had checked out, go ahead and tell us again, chronologically, the way you remember it happening, up to the time the vehicle in which the defendant, Mikorey, was driving came by.

"   .     .     .

"A   Well, I just flagged them down and checked their driver's license.  Mikorey, he was driving.  I asked him for driver's license and registration and he handed me a driver's license and a rental contract.

"Q   All right, at that point was there any conversation about it being a rental car?

"A   No, sir, I could see that with the contract.

"Q   All right.

"A   I told him to pull over to the side, then I had some more traffic backed up, I think, and I waved them on by, probably checked one more, two more cars, I don't know, you know, driver's license, registration.

"   .     .     .

"Q   Okay, and as you approached the window this time, do you recall what was said by you and by the defendant?

"A   Yeah, I asked Mr. Mikorey, I asked him what he had in the trunk.

"Q   Okay, why did you ask him that?

"A   Why?  Cause I suspected him of hauling marijuana.

"Q   Why at that point?

"A   Well, I could, I thought I could smell it.  I didn't know for sure if I could smell it or not.  I smelled what appeared to be marijuana, but I didn't know.

"Q   Did you observe anything about the automobile?

"A   Well, yes, it was heavily loaded, had a bunch of big paintings and stuff in the back seat, you know, which could have fit in the trunk.

"Q   Okay, and you asked him then what he did have in the automobile?

"A   Yes, I asked him, I said, what he had in the trunk of the car.                    .

"Q   And he answered, to the best of your recollection, by what?

"A   Luggage, clothes.

"Q   And what did you do then?

"A   I said, 'Do you mind if I take a look?' [in the trunk]

"Q   And how did you respond?

"A   He said, 'No.'  So he got out of the car, walked around to the trunk, started to open it, and I told him, I said, 'You realize you don't have to open the trunk.'  And he wanted to know why I wanted to look in

there, and I told him that we was looking for marijuana, and I said, 'We could go to town and get a search warrant,' whatever he—it would probably be better for him if we did.

"Q If you did what?

"A Went to town and got a search warrant.

"  .   .   .

"Q All right, did you, up to that point, had you made any—well, had the defendant asked what would happen if he did not—had you made any statements as to what would happen if he did not let you look in the trunk, anything of this nature?

"A No, he never denied me that I couldn't look in the trunk.

"  .   .   .

"Q Okay, so the trunk then was opened. Who opened it?

"A Mikorey.

"Q And what happened once the trunk was opened?

"A Okay, I asked him what he had in the suitcases and he said, 'Clothes,' and I said, 'What do you have in the gold suitcase?' which was setting on top, and he said, 'Nothing.' I said, 'Would you open it?' He opened, he pulled it out of the car first and set it on the ground.

"Q Okay, was—did he make any statement when you said, 'Would you open it?' did he make any statement or—

"A No, he didn't.

"Q —shake his head?

"A He didn't want to open it, but he didn't make any statements or anything. He hesitated, and so he picked it back up and set it in the trunk of the car, and I said, 'Are you going to open that for me?' And he said, 'Okay.' So he opened it and there was some marijuana residue in there.

"Q All right, anything else in the trunk other than the marijuana, or substance you believed to be marijuana?

"A Yes, sir, I think there was two more suitcases, I believe, and a green, I don't remember what color it was, I think it was green trunk, footlocker.

"Q Okay, but was the gold suitcase, was it empty other than the residue that you have described?

"A Yes, sir.

"Q And approximately how much residue—when you, when we talk of residue, how much are you talking about? How much did you see in that gold suitcase?

"A Not very much, you know, just a little bit on the bottom.

"Q All right, not very much. Can you—

"A Well, like—

"Q —be a handfull?

"A Like a baggie full, or something.

"Q As much—

"A I don't know if it was that much.

"Q Approximately a baggie if it was put together?

"A Yes, sir.

"Q All right, upon the trunk being opened, did you receive any other essential sensation, anything come to your attention upon the trunk being opened?

"A Sure. I could smell the marijuana from the trunk.

"Q Okay.

"A I knew it wasn't that what I smelled in that suitcase, I knew it wasn't that.

"  .   .   .

"Q Okay, so when you, in the trunk, what I refer to as the Mikorey automobile, there was an odor, a definite odor that you recognized.

"A Yes, when the trunk was opened."
Cross-examination of Williams by defendants.

"Q Okay, now, at the time that you stopped the Mikorey vehicle, did you have any reasonable cause to believe that that vehicle was unsafe or not equipped as required by law?

"A No, I knew it was hauling marijuana, or something, there was something wrong with it.

"Q Okay, did you have any reason to believe that its equipment was not in proper adjustment or repair?

"A No, I'm not a mechanic.

"Q Okay, did you have any reason to believe that the driver did not have a valid license or registration?

"A That's why I asked him, to see if he did have.

"Q I see. Did you have any reason to believe that the automobile was stolen?

"A No, I knew it was a rent car, a rental car. I suspected it, being a rental car.

"Q Then why did you stop it?

"A Why did I stop him?

"Q Yeah.

"A Because I figured he was hauling marijuana.

"Q This is before you, before you even approached the car?

"A Yeah.

"Q Now, you said that you do not search all the cars unless you have reason to, right?

"A Right.

"Q And that day did you search some of the other cars?

"A Yes, sir.

"Q I see. What were the reasons that you searched those other cars?

"A Like one I thought was a stolen vehicle, which I had run it through on the computer, but it come back that it wasn't stolen, but like California, they don't enter their vehicles until 24 hours after they have been missing and they can be further than here in 24 hours and not ever be entered in the computer, and I check them, see if their spare tire and stuff are in there. You know, usually, somebody steals a car, they got no money, so they take the spare tire out and jacks and sell them.

"Q Well, did you have any reason to believe that any of the cars that you searched were, in fact, stolen?

"A Yeah, I just said I did.

"Q Okay, what led you to believe that they might have been stolen?

"A By the way the people act, by the car they are driving. You take a 'skroag' driving a Lincoln Continental, a ten thousand dollar car and he don't even have shoes to put on, something wrong.

"Q A what? What did you call—

"A Hippie, skroag, whatever.

" . . .

"Q (Continuing by Mr. Rosenberg.) Did you encounter any vehicles like that that day?

"A Oh, yeah, I encounter a lot of them.

"Q Did you stop them and search them?

"A Oh, some of them I did. I can tell whether they are hauling dope, usually.

"Q So, then the reason that you signalled to Mr. Mikorey to stop at that roadblock is because you suspected he was hauling dope?

"A Uh huh.

"Q And what was it about that car, its appearance as it approached you that led you to believe it was hauling dope?

"A Rent car. Nearly every car we pick up hauling marijuana is a lease vehicle.

"Q I see. Do you every encounter any leased vehicles that don't have marijuana?

"A No, I haven't.

"Q Or do you just stop the lease cars that have marijuana and let the lease cars that don't have marijuana go by?

"A Well, yeah. Why would I want to stop the ones that didn't have marijuana?

"Q What was it about this car that led you to believe that it was a lease car before you stopped it?

"A I can tell a lease car.

"Q What is it about a car that—

"A Well, all of them has got a little sticker in the window, and some of them has got them up behind the mirror or on the bumper.

"Q I see. And where did this car have its sticker?

"A   I think it was on the left or right side of the windshield up at the top.

"Q   And what did it say?

"A   It's just got numbers on it.

"Q   And that's what led you to believe that it was a rent car?

"A   Uh huh.

"Q   And that it was hauling marijuana.

"A   Yes, sir.   That, and then the two people in the car.

"Q   What was it about the two people in the car?

"A   They just looked like dope haulers.

"Q   Okay, what do dope haulers look like?

"A   Just like that.

".   .   .

"Q   Would you tell the Court, would you describe to the Court what their appearance was on the day in question that led you to believe that they were dope haulers.

"A   I just told you.

"Q   What was it?

"A   Well, they just look like dope haulers.

"Q   Okay.

"A   I got my own way of telling..

"THE COURT: How would I know what to look for if I were looking for a dope hauler, Mr. Williams?

"THE WITNESS: Well, your Honor, you would have to go through the State Police school and be out on the highway and know, you can tell these people.   I mean, you have to do it with experience, you just, you couldn't just jump out there say that guy, I think, is hauling dope.

"THE COURT: Go ahead.

"Q   (continuing by Mr. Rosenberg)   When in your State Police school did they tell you how to identify dope haulers?

"A   No, like I said, it comes with experience.

"Q   I see.   Was it their age?

"A   No, I didn't know how old they was.

"Q   Okay, was it their length of hair?

"A   No.

"Q   Was it the clothes they were wearing?

"A.  No.   It was by the way they acted. Like I said, I got my own way of telling which you wouldn't have.

"Q   Okay.

"A   You know, I can't explain it to you.

"Q   So you, you knew before that car even came to a stop, you felt in your own mind it was hauling—

"A   No.

"Q   —dope?

"A   I had a good idea it was when I found out it was a rent car, lease car.

"Q   And there was something about the people in the car that you can't really describe to us that you knew?

"A   Sure.

"Q   Okay.

"A   Nervous.

"Q   Who was nervous?

"A   Mikorey.

"Q   He was nervous?

"A   I never did talk to Bloom at the initial contact.

"Q   What would you have done if Mikorey hadn't let you look in his trunk?

"A   What would I have done?

"Q   Yeah.

"A   I would have probably brought him to town and obtained a search warrant.

"Q   Did you tell him that?

"A   No, he never did tell me I couldn't look in there.

"Q   Okay.   What purpose were you there originally on the highway, for what purpose were you there originally on the highway?

".   .   .

"A   Like I said, we was checking for stolen cars, driver's license, registration checks, equipment checks, marijuana.

"Q   Just—

"A   Pills, we pick up a lot of pills.

"Q   I see.   Just more or less anything you could find?

"A   Anything that's illegal.

"Q   That you could find.

"A   Yeah.  We usually find it, you know, if it's illegal.

"Q   In other words, that was the purpose that you established this roadblock.

"A   Yes, sir.

".     .    .

"Q   Now, after Mr. Mikorey gave you his driver's license and registration, was there anything about those that appeared to be in violation of any law or statute, Motor Vehicle Code?

"A   No, except Mr. Mikorey said the lease contract had a due date on it and it didn't, it was an indefinite contract."

Re-direct examination.

"Q   Okay, is this a factor in your conclusion that this, as you stated, figured he was hauling marijuana?  Is the rental car existence, is that a, a factor?

"A   Yes, sir, because they rent these cars.  That's the way, this way we can't confiscate them.

"Q   All right, based on your experience, then, that's a very common occasion for marijuana to be hauled in rental cars.

"A   Yes, sir, that's in, anybody picks up marijuana, most of the arrests are made out of rental vehicles.

"Q   Okay, now, you mentioned in your direct examination the fact that the car was heavily loaded in the rear.  Is that a factor?

"A   Well, it was loaded, it wasn't heavily loaded.  I mean it wasn't setting down on the ground, but I could tell there was something in the trunk, either that or he had real bad shocks, one of the two.

"Q   Okay, and you have also mentioned seeing clothes and pictures and this type thing in the back seat.  Is that one of the factors that you might put together with the others to justify some seeking out or further—

"A   Well, I figured, you know, them pictures, they could have put them in the trunk.  There had to be something in the trunk, where the pictures wouldn't go.  I wouldn't think they would haul them in the back seat.

"Q   In other words, if they have marijuana in the trunk, they would have to put their clothes and other objects in the back seat?

"A   Yes, sir.

"Q   So all these combinations are factors, is that correct?

"A   Yes, sir.

"Q   Plus, you stated the way they acted when they see a police officer is—am I quoting you right there, is that a factor?

"A   Yes, sir, they get nervous.

"Q   Okay, do you find that a normal tourist, say, upon being stopped by police officer gets nervous?  Are you talking about something different, or can you elaborate a little?

"A   No.  Like I said, lot of them don't get nervous if you stop them and give them a ticket, they don't get real nervous.  May get a little mad, but they don't get nervous."

Defendants' motion to suppress was based on the fact ".   .   . [t]hat said stop, search, seizure and arrest was made without the necessary probable cause to support the actions of Officer Williams." The trial court denied the motion to suppress and ".   .   . found that the arrest, search and seizure occurring on January 27, 1975, was not an unreasonable search and seizure as defined by the Constitution of the United States."

Subsequently, defendants filed a motion asking the trial court to reconsider its ruling on defendants' motion to suppress together with a trial brief which reemphasized the fact that Patrolman Williams was ".   .   .   selectively stopping vehicles based on past experience when he saw 'scrods', 'hippies', 'longhairs' and rental cars, etc.   .   .   ." The motion to reconsider was also denied.

### The Stop

We first consider the basic authority of Officer Williams to conduct a driver's license and vehicle registration check.  The two following statutory sections are pertinent.  Section 64–3–11, N.M.S.A.1953 (2d Repl. Vol. 9, pt. 2, 1972) states in part:

". . . Every such registration evidence or duplicates thereof certified by the division shall be exhibited upon demand of any police officer."

Section 64–13–49, N.M.S.A.1953 (2d Repl. Vol. 9, pt. 2, 1972) states:

". . . *License to be carried and exhibited on demand.*—Every licensee shall have his operator's or chauffeur's license in his immediate possession at all times when operating a motor vehicle and shall display the same upon demand of a justice of the peace, a peace officer, or a field deputy or inspector of the division. However, no person charged with violating this section shall be convicted if he produces in court an operator's or chauffeur's license theretofore issued to him and valid at the time of his arrest."

Compare the cases of *United States v. Cupps*, 503 F.2d 277 (6th Cir. 1974); *Morgan v. Town of Heidelberg*, 246 Miss. 481, 150 So.2d 512 (1963); *Murphy v. State*, 194 Tenn. 698, 254 S.W.2d 979 (1953); *Cox v. State*, 181 Tenn. 344, 181 S.W.2d 338 (1944) and *State v. Severance*, 108 N.H. 404, 237 A.2d 683 (1968) and cases cited therein regarding statutes similar to New Mexico.

No New Mexico cases have dealt directly with §§ 64–3–11, supra, 64–13–49, supra. See *State v. Lewis*, 80 N.M. 274, 454 P.2d 360 (Ct.App.1969); *State v. Slicker*, 79 N.M. 677, 448 P.2d 478 (Ct.App.1968). See also *United States v. Fallon*, 457 F.2d 15 (10th Cir. 1972). However, in *United States v. Jenkins*, 528 F.2d 713 (10th Cir. 1975) the court stated:

"In stopping Jenkins' vehicle the patrolman was acting pursuant to 64–3–11 and 64–13–49, New Mexico Statutes Annotated. 64–3–11 provides that every owner of a vehicle shall exhibit his vehicle registration papers 'upon demand of any police officer.' 64–13–49 provides that every driver shall display his driver's license 'upon demand of a justice of the peace, a peace officer, or a field deputy or inspector of the division.' However, even though the patrolman in the instant case may well have been acting in accord with New Mexico law, his actions must still comport with the requirements of the Fourth Amendment to the United States Constitution. . . ."

We further note that there is support for the statutory authority granted by footnote 8, in *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) wherein the court stated in part:

". . . Our decision thus does not imply that state and local enforcement agencies are without power to conduct such limited stops as are necessary to enforce laws regarding driver's licenses, vehicle registration, truck weights, and similar matters."

Compare also *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) where the court held, with regard to inspecting records and a storeroom of a federally licensed gun dealer, that where regulatory inspections further urge federal interests and the possibilities of abuse and threat to privacy are not of impressive dimensions, the inspection may proceed without a warrant wherein specifically authorized by statute.

We believe that the same rationale applies to the above quoted statutes. Here there is an urgent state interest involved. The New Mexico State Police Report for 1974, page 63, states that there is a motor vehicle theft in New Mexico every two hours and thirty-six minutes. It further states at page 9 that there was a total of 39,471 traffic accidents in New Mexico of which 10,463 were investigated by the State Police. The checking of drivers licenses will tend to protect the public in that it can keep many unsafe drivers off the highways. *City of Miami v. Arnovitz*, 44 So.2d 784 (Fla.1959).

█ In view of the foregoing, we hold that the above quoted statutes grant the police the unquestioned good faith right to detain motor vehicles for the purposes specified therein. Compare *Commonwealth v. Swanger*, 300 A.2d 66 (Pa.1973) affirmed on reargument, 453 Pa. 107, 307 A.2d 875 (1973).

However, the actions of the police must be in conformity with the constitutional requirements of the Fourth Amendment. See *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *United States v. Jenkins*, supra. When the detention permitted by the statute becomes a mere subterfuge or excuse for some other purpose which would not be lawful the actions then become unreasonable and fail to meet the constitutional requirement. *Murphy v. State*, supra; *Morgan v. Town of Heidelberg*, supra; *Coston v. Mississippi*, 252 Miss. 257, 172 So.2d 764 (1965). Compare *City of Miami v. Arnovitz*, supra.

■ In reviewing the record of the motion to suppress we have no doubt that the stopping of defendants' vehicle and requesting the driver's license and registration was merely an excuse to go beyond the sanctions permitted by the statute as viewed from the constitutional mandate. One cannot do by indirection that which is directly prohibited. We are unwilling to sanction such conduct. The detention, under the record of this case, was a mere subterfuge and cannot be condoned. The motion to suppress should have been granted.

In so holding we are not avoiding the traditional standards of appellate review. *State v. Bidegain*, 88 N.M. 466, 541 P.2d 971 (1975). However, there are certain cases where the traditional approach would be closing one's eyes to the realities of the situation. We feel the present record presents such a case.

The cold sterile record on appeal speaks with clarity and certainty as to the realities of the reason for the detention. Any other approach by us would be · ". . . [a]phlegmatic detachment of such magnitude . . . [which] boggles the mind." *Mares v. State*, 83 N.M. 225, 490 P.2d 667 (1971) reversing *State v. Mares*, 82 N.M. 682, 486 P.2d 618 (Ct.App.1971).

### Lawful Arrest

After Patrolman Williams discovered the marijuana he placed Mikorey under arrest and attempted to handcuff him. Bloom then got out of the car and came toward Williams and said: "What's going on?" Officer Williams told Bloom that he too was under arrest for possession of marijuana over eight ounces. As Officer Williams reached over to grab defendant Bloom's hand, Bloom jerked away. It was at this time that Bloom jerked Officer Williams' pistol out of his holster. Officer Williams grabbed for the pistol and Mikorey pushed the officer from behind and knocked him off his balance. Bloom then stepped back about four or five feet and told Officer Williams that he was going to kill him. Bloom then told Mikorey to get Officer Williams' radio mike and car keys. Mikorey then walked over to the police car, and pulled out the mike and took the car keys. Defendants Mikorey and Bloom then jumped into their car and drove off. The defendants were rearrested at a later time.

There may be cases where ". . . in the lawful discharge of his duties . ." there is a distinct question apart from the validity of the arrest. *State v. Frazier*, 88 N.M. 103, 537 P.2d 711 (Ct.App.1975). In the instant case whether the arrest was valid depends on whether the officer was ". . . in the lawful discharge of his duties . . . ."

■ We first decide the meaning of "lawful discharge of his duties." The powers and duties of the state police are prescribed by statute. Section 39–2–17(a), N.M.S.A.1953 (2d Repl. Vol. 6, 1972) states:

". . . They shall be conservators of the peace within the state of New Mexico, with full power to apprehend, arrest and bring before the proper court *all law violators* within the state of New Mexico." (Emphasis Ours)

Possession of marijuana is a violation of the law. Section 54–11–23(B)(3), supra.

Although we have held that the marijuana must be suppressed, because the search and seizure was the fruit of the illegal detention, we nonetheless hold that the arrests by the officer, after smelling and seeing the marijuana, was in the "lawful discharge of his duties."

To hold otherwise would place the officer in the position of not being able to seize

obvious known contraband even though he was not lawfully in the area of the contraband. The remedy for the seizure is suppression. That, however, does not negate a lawful arrest under the facts of this case. The arrest was legal. But the convictions following such arrest would be based on nonadmissible evidence (the marijuana seized). Those convictions must be reversed.

*Escape from Custody of a Police Officer*

Section 40A–22–10, N.M.S.A.1953 (2d Repl. Vol. 6, 1972) states in part:

". . . Escape from custody of a peace officer consists of any person who shall have been placed under lawful arrest for the commission or alleged commission of any felony, unlawfully escaping or attempting to escape from the custody or control of any peace officer."

The issue here necessarily turns upon the question of ". . . who shall have been placed under a lawful arrest . . . ." As we have heretofore held the arrests were lawful. Thus, the defendants' convictions of escape from custody are affirmed. *State v. Lopez*, 79 N.M. 235, 441 P.2d 764 (1968); *State v. Martinez*, 79 N.M. 232, 441 P.2d 761 (1968).

Having held the seizure illegal we do not reach defendants' third issue relating to disclosure.

Accordingly, the convictions of both defendants of possession of marijuana are reversed. The conviction of aggravated assault upon a peace officer by defendant Bloom and battery upon a police officer by defendant Mikorey, and of escape from custody of a police officer are affirmed.

IT IS SO ORDERED.

HERNANDEZ, J., concurs.

WOOD, C. J., dissenting in part and concurring in part.

WOOD, Chief Judge (dissenting in part and concurring in part).

The majority hold that the officer illegally stopped and detained defendants. I disagree. The officer's testimony is contradictory. As to the initial stop, the officer testified defendants' car was stopped because the officer figured defendants were hauling marijuana. The officer also testified that he was manning a general roadblock, checking driver's licenses, car registrations, checking for stolen cars, anything illegal. The evidence is clear that other vehicles were being stopped and checked. A Marine AWOL had been apprehended and was in the officer's car when defendants' car was stopped.

As to having defendants pull off the road and wait, again the evidence is in conflict. The officer indicated this was done because defendants looked like dope haulers and the officer "figured" marijuana was being hauled. On the other hand, the officer testified he was suspicious that marijuana was being hauled because the car was a lease car, the way the car was loaded, the nervous way the defendants acted and because the officer thought he smelled marijuana, although he was not sure.

As to the opening of the trunk, the evidence is again contradictory. The officer's testimony that Mikorey consented is not directly contradicted. However, the context of the officer's testimony would permit the inference that consent was under a threat to get a search warrant.

Conflicts in the testimony of the officer were to be resolved by the fact finder. *State v. Landlee*, 85 N.M. 449, 513 P.2d 186 (Ct.App.1973). Our function, on appellate review, is to view the evidence in the light most favorable to the trial court's decision and determine whether the evidence substantially supports the trial court's decision. *State v. Bidegain*, 88 N.M. 466, 541 P.2d 971 (1975). Under this standard, the trial court's denial of the motion to suppress should be affirmed. Accordingly, I would affirm the marijuana convictions.

I concur in the affirmance of the other convictions. Even under the majority view that the stop and detention was illegal, I agree that the officer was in the lawful discharge of his duties at the time of the

assault and battery on him by the defendants. The officer was clearly performing his lawful duties in arresting defendants for possession of contraband which the officer had seen and smelled. *State v. Frazier*, 88 N.M. 103, 537 P.2d 711 (Ct.App.1975) is not to the contrary.