1999-NMSC-037

993 P.2d 74

**STATE of New Mexico, Plaintiff–Respondent,**

v.

**PAUL T., a child, Defendant–Petitioner.**

No. 24492.

Supreme Court of New Mexico.

Aug. 31, 1999.

Rehearing Denied Oct. 18, 1999.

Phyllis H. Subin, Chief Public Defender, Lisabeth L. Occhialino, Assistant Appellant Defender, Albuquerque, for Petitioner.

Hon. Patricia A. Madrid, Attorney General, Ann M. Harvey, Assistant Attorney General, Santa Fe, for Respondent.

## OPINION

FRANCHINI, Justice.

{1}   Paul T. contests the children's court's denial of his motion to suppress certain evidence used against him in a delinquency proceeding.   The Court of Appeals affirmed

the children's court, holding that the initial pat down of Paul's person was a valid protective search and that the subsequent search of Paul's pockets was reasonable under the circumstances. The Court of Appeals rejected Paul's argument that the pat-down search was pretextual, deciding that the argument depended on determinations of credibility and weight on which the appellate court should defer to the trier of fact. Because the Court of Appeals found the search of Paul's pockets reasonable under the circumstances, it did not reach the issue of whether Paul's alleged consent was voluntary.

{2} We affirm the Court of Appeals on the issue of whether the initial pat down was a valid protective search, though we base our holding on an objective standard instead of an analysis of whether the search was pretextual. We reverse the Court of Appeals on the issue of whether the subsequent search of Paul's pockets was reasonable under the circumstances. We also reject the State's argument that the searches could be sustained as a search incident to an arrest. We hold that the search of Paul's pockets was unlawful without his valid consent, and therefore we remand to the children's court for a factual determination of voluntariness and full consideration of the validity of Paul's consent.

*FACTS AND PROCEDURAL POSTURE*

{3} Shortly after midnight on September 9, 1995, Officer John Serna of the Alamagordo Department of Public Safety stopped an automobile operating with only one headlight. While conferring with the driver, Officer Serna recognized Paul, who he knew was under the age of sixteen, in the rear passenger seat. Since it was a Saturday, Alamagordo's juvenile curfew ordinance had gone into effect at midnight. *See* Alamagordo, N.M., Code of Ordinances, § 11–03–040 (1960).

{4} Paul confirmed for Officer Serna his name and that he was fifteen years old. He told Officer Serna that he lived six blocks away, that he was on his way home, and that his sister was his guardian that evening. Officer Serna attempted to reach Paul's parents at the phone number Paul gave him, but was unable to do so. Serna cited the driver for the headlight infraction, determined Paul was in violation of curfew, and asked Paul to step out of the car. Paul complied.

{5} Section 11–03–040(c) of the curfew ordinance provides: "It shall be the duty of peace officers to apprehend and take into custody any minor found in violation of this section." The ordinance requires the officer to attempt to notify the parent or guardian of the juvenile and mandates that "such parent or guardian shall be deemed guilty of permitting a violation of this section." *Id.* The juvenile is released to the "parent or guardian or other person having care or custody of the minor, upon written promise that such parent or guardian will assume the responsibility that said child will comply with [the curfew ordinance]." Section 11–03–040(e).

{6} Before placing Paul in his police cruiser, Officer Serna patted him down. During the pat-down search, Officer Serna felt several items in Paul's pockets, "some of which were solid and others softer." He asked for and received Paul's permission to empty his pockets. The subsequent search revealed a sandwich-sized plastic bag containing a small amount of marijuana, a package of cigarette rolling papers, and several coins wrapped in pink tissue paper. Following this discovery, Officer Serna took Paul to the police station, completed an Incident Report, and then released Paul to his sister's custody. Later, Officer Serna contacted Paul's mother and issued her a citation for the curfew violation.

{7} On October 10, 1995, the State filed a delinquency petition in children's court charging Paul with possession of one ounce or less of marijuana, contrary to NMSA 1978, § 30–31–23 (1990), as well as possession of drug paraphernalia, contrary to NMSA 1978, § 30–31–25.1(A) (1981, prior to 1997 amendment). Paul moved to suppress the evidence seized as a result of the pat-down search and the search of his pockets, contending that the searches were unlawful. The children's court denied Paul's motion, whereupon he entered a no contest plea to both charges, reserving the right to appeal the suppression ruling. After the Court of Appeals affirmed the ruling, we granted certiorari and now affirm in part, reverse in part, and remand.

*DISCUSSION*

■ {8} "The issue of suppression ... raises a mixed question of law and fact and our review on appeal is de novo." *State v. Duffy*, 1998–NMSC–014, ¶ 62, 126 N.M. 132, 967 P.2d 807.

■ {9} Paul contends that the evidence against him was obtained in violation of the Fourth Amendment to the United States Constitution and Article II, Section 10 of the New Mexico Constitution. Both provisions proscribe unreasonable searches by state officials. *See Mapp v. Ohio*, 367 U.S. 643, 648, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *State v. Gutierrez*, 116 N.M. 431, 444, 863 P.2d 1052, 1065 (1993). The United States Supreme Court has held that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (footnote omitted). Similarly, while this Court has avoided bright-line, per se rules in determining the reasonableness of searches under Article II, Section 10, *see Gomez*, 1997–NMSC–006, ¶¶ 44–46, 122 N.M. 777, 932 P.2d 1, we have "consistently ... expressed a strong preference for warrants." *Id.* ¶ 36.

■ {10} The State attempts to justify the warrantless search of Paul's person on three independent grounds, arguing first that it was "akin" to a search incident to arrest, second, that it was no more than a protective search for weapons under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and third, that Paul validly consented to Officer Serna's search of his pockets. "[T]he State bears the burden of proving facts that justify a warrantless search and seizure." *State v. Martinez*, 1997–NMCA–048, ¶ 9, 123

N.M. 405, 940 P.2d 1200. We hold that the facts of this case do not support the State's first two arguments.[1]

■ {11} The State analogizes the search of Paul's pockets in this case to a search incident to arrest, thereby obviating the need for a warrant or valid consent from Paul. Under the Fourth Amendment, the police may lawfully conduct a full, warrantless search of the arrestee's person without his or her permission. *See Chimel v. California*, 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). This exception to the warrant requirement arose out of the possible danger that a person who is arrested might be hiding a weapon or that evidence of a crime might be destroyed or concealed. *See id.; see also State v. Arredondo*, 1997–NMCA–081, ¶ 29, 123 N.M. 628, 944 P.2d 276 (utilizing both rationales to evaluate a search incident to arrest under Article II, § 10).

{12} In *United States v. Robinson*, a case involving an arrest for a traffic violation, the United States Supreme Court concluded that the authority to conduct a full field search incident to a "custodial arrest" was a bright-line rule that did not depend in every case upon the existence of a concern for officer safety or the destruction or loss of evidence. *See* 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). It is not clear whether that Court would extend the holding of *Robinson* to this case, where Paul was taken into custody but not formally arrested. *See People v. Brisendine*, 13 Cal.3d 528, 119 Cal.Rptr. 315, 531 P.2d 1099, 1110 n. 14 (1975) (in bank) (lamenting ambiguity of the phrase "custodial arrest" in *Robinson*). On one hand, the *Robinson* Court noted the "danger to an officer ... in the case of the extended exposure which follows the taking of a suspect into custody and transporting him to the police station," and concluded: "This is an adequate basis for treating all

---

1. In addition to its three principal arguments, the State also asserts, in passing, that this case "resembles a community caretaker type of situation." Besides the failure of the State to develop this argument, let alone say how it was preserved, Paul points out that the State stipulated below that he was "in custody" and "seized" within the meaning of the Fourth Amendment, making the community caretaking line of cases

inapplicable. *See State v. Walters*, 1997–NMCA–013, ¶ 10, 123 N.M. 88, 934 P.2d 282; *see also State v. Padilla*, 88 N.M. 160, 162, 538 P.2d 802, 804 (Ct.App.1975) (adjudging issues argued unclearly to be abandoned); Rule 12–213(4) NMRA 1999 (requiring parties to specify manner in which issues were preserved). This argument has no merit.

custodial arrests alike for purposes of search justification." 414 U.S. at 234–35, 94 S.Ct. 467. On the other hand, the Court seemed swayed by the existence of empirical studies indicating the mortal danger to police officers in making arrests after routine traffic stops, *see id.* at 234 n. 5, 94 S.Ct. 467 whereas no such evidence exists in this case regarding curfew violations by juveniles. Neither Paul nor the State have brought to our attention any cases under the federal constitution involving a factual scenario similar to the instant one. *Cf. People v. Maher,* 17 Cal.3d 196, 130 Cal.Rptr. 508, 550 P.2d 1044, 1047 (1976) (holding under state constitution that "a full body search incident to arrest is impermissible when the person is arrested for an offense for which he will merely be cited or released on bail"). Because of this gap in Fourth Amendment jurisprudence, together with the possibility that the Fourth Amendment does not protect Paul in the circumstances of this case, we turn to Article II, Section 10 to resolve the issue of whether Officer Serna's emptying of Paul's pockets was lawful as analogous to a search incident to arrest. *See Gomez,* 1997–NMSC–006, ¶¶ 19–20, 22–23, 122 N.M. 777, 932 P.2d 1 (holding that interstitial interpretation of a provision of the New Mexico Constitution is appropriate where law under the federal analog is undeveloped, provided the defendant preserved his or her state constitutional claim in the trial court).

{13} Paul preserved his claim that Article II, Section 10 protects him in the circumstances of this case from a full search incident to arrest. In *Gomez,* we held that where, as here, there is established precedent interpreting Article II, Section 10 more broadly than its federal counterpart, the defendant's claim "may be preserved by (1) asserting the constitutional provision that provides the protection sought under the New Mexico Constitution, and (2) showing the factual basis needed for the trial court to rule on the issue." *Id.* ¶ 22. Paul met the first requirement by stating in his response brief on the suppression issue that "our New Mexico Constitution offers greater safeguards from unreasonable searches and seizures than the United States Constitution." In the same brief, Paul also alerted the chil-

dren's court to his contention that the factual scenario of this case, where he was taken into custody for a curfew violation but not arrested, invalidated the State's argument that "'this situation is similar to a lawful arrest without a warrant.'" Paul argued in the brief that "[a]ny attempt to uphold the search by reference to protective custody and arrest is not sustainable." *Gomez* requires no more.

{14} Looking as we do at the particular facts of each search in determining reasonableness, we hold under Article II, Section 10 that the search of Paul's pockets cannot be considered as "akin" to a search incident to arrest. A full-blown field search is simply not justified under the facts presented here. Here, Paul was taken into custody for a curfew violation, a non-criminal offense that did not involve an emergency situation. *Compare State v. Keyes,* 61 Or.App. 434, 657 P.2d 724, 725–26 (1983) (affirming suppression of evidence rooted out in full search of an individual on "civil hold" for public intoxication), *with State v. Marsh,* 1 Or.App. 351, 462 P.2d 459, 461 (1969) (in banc) (upholding admission of evidence of illegal drug use discovered while police tried to ascertain nature of medication belonging to an emotionally disturbed defendant they had taken into emergency protective custody). Paul cooperated fully with Officer Serna, and Officer Serna never expressed any sense of endangerment from Paul particularly, who he estimated was nearly a foot shorter and a hundred pounds lighter than himself. Apparently Officer Serna knew Paul, and on the previous occasions they had met, Paul did not have any weapons, did not run, and did not hit, threaten, cuss at, become violent, or otherwise cause Officer Serna to be concerned for his own safety. *Compare Jackson v. State,* 791 P.2d 1023, 1029 (Alaska Ct.App.1990) (per curiam) (rejecting search for atypical weapons in wallet in part because officer's prior encounters with defendant gave him no reason to suspect such weapons), *with United States v. Sills,* 120 F.3d 917, 919 (8th Cir. 1997) (holding search of car for weapons justified where defendant had become irate at police earlier in the day, was belligerent

upon arrest, and reliable informant said he was armed). Understandably, Officer Serna had a generalized concern about any person in custody sitting behind him in the rear seat of his patrol car, but we note that with regard to Paul's transport specifically, Officer Serna could not recall whether his cruiser had a plexiglass screen, a screen grid, or no screen at all separating the front and back seats, suggesting that he was not worried that Paul might pose a danger to him. We evaluate all of these circumstances objectively, *see Martinez,* 1997–NMCA–048, ¶ 15, 123 N.M. 405, 940 P.2d 1200 and considered in light of a concern for officer safety, we hold under Article II, Section 10 that they do not rise to a level necessitating a full search analogous to a search incident to arrest.

{15} We reach the same conclusion with respect to the other historic rationale for a search incident to arrest—preservation of evidence. Once Paul told Officer Serna that he was fifteen years old, the possibility that additional evidence of a curfew violation existed in his pockets, and that he would destroy such evidence, is too remote to justify a full-blown search of Paul's person. *Cf. Knowles v. Iowa,* 525 U.S. 113, 119 S.Ct. 484, 488, 142 L.Ed.2d 492 (1998) (holding search of a speeding motorist unreasonable where "[n]o further evidence of excessive speed was going to be found either on the person of the offender or in the passenger compartment of the car"). At the suppression hearing, Officer Serna suggested that a search of Paul's pockets was necessary because "people placed in police cars frequently dispose of contraband." However, to guard against such an eventuality, many police departments have regulations requiring officers to search the passenger compartments of their vehicles after transporting a person who has been taken into custody. *See, e.g., Miller v. State,* 634 So.2d 127, 128 (Miss.1994). Such a procedure would be appropriate in this case.

{16} Next, we turn back to the Fourth Amendment and the State's alternative argument that *Terry* justifies Officer Serna's search of Paul's person. We hold that *Terry* provides the proper analytical framework for this case. The "crux of this case" is the same as in *Terry,* that is, "whether there was justification for [the officer's] invasion of [the defendant's] personal security by searching him for weapons." 392 U.S. at 23, 88 S.Ct. 1868. Whether adequate justification exists is an objective question. *See id.* at 27, 88 S.Ct. 1868. We agree with the State that Officer Serna was justified in conducting a *Terry*-type protective search before placing Paul in the back seat of his patrol car. The fact that the curfew ordinance mandated that Officer Serna take Paul into custody supplies the necessary justification for a pat-down search of Paul's person.[2] *See Brisendine,* 119 Cal.Rptr. 315, 531 P.2d at 1109 ("[T]he necessity of close proximity will itself provide the needed basis for a protective pat-down of the person."); *People v. Superior Court,* 110 Cal.Rptr. 875, 880 (Cal. Dist.Ct.App.1973) ("We conclude that the element of transportation in a police vehicle is a special circumstance which justifies a *pat-down search* of the individual to be transported in a *non-arrest* situation."). However, the question remains whether Officer Serna, in emptying Paul's pockets, exceeded the scope of a *Terry*-type protective search.

{17} Under *Terry,* to initiate a protective search, police must have "specific and articulable facts" on which they premise their assessment of danger. 392 U.S. at 21, 88 S.Ct. 1868. The search must be "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Id.* at 26, 88 S.Ct. 1868. "The search for weapons approved in *Terry* consisted solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault." *Sibron v. New York,* 392 U.S. 40, 65, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). "If the protective search goes be-

---

**2.** Paul now contends in this Court that the curfew ordinance is unconstitutional and/or preempted by the Delinquency Act, but because those arguments were not preserved below, we do not address them. *See Garcia ex rel. Garcia v.*

*La Farge,* 119 N.M. 532, 540, 893 P.2d 428, 436 (1995) (observing that purposes of preservation requirement are to alert the trial court to error in time for correction and to give other side a fair opportunity to meet the case presented).

yond what is necessary to determine [whether] the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Minnesota v. Dickerson*, 508 U.S. 366, 373, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).

{18} Again, our test is an objective one. Officer Serna need not "have been absolutely certain that the individual [was] armed; the [only question] is whether a reasonably prudent man in the circumstances would [have been] warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27, 88 S.Ct. 1868. "If by touch the officer remains uncertain as to whether the article producing the bulge might be a weapon, he is entitled to remove it." *United States v. Oates*, 560 F.2d 45, 62 (2nd Cir.1977). According to Professor La-Fave, delving into a person's pockets in a search for weapons "is not permissible when the object felt is soft in nature." 4 Wayne R. LaFave, *Search and Seizure* § 9.5(c), at 278 (3rd ed.1996). Professor LaFave goes on to instruct:

> If the object felt is hard, then the question is whether its "size or density" is such that it might be a weapon. But because "weapons are not always of an easily discernible shape," it is not inevitably essential that the officer feel the outline of a pistol or something of that nature. Somewhat more leeway must be allowed upon "the feeling of a hard object of substantial size, the precise shape or nature of which is not discernible through outer clothing," which is most likely to occur when the suspect is wearing heavy clothing. Under this approach, courts have upheld as proper searches which turned up certain objects other than guns, such as a pocket tape recorder, a pipe, a pair of pliers, cigarette lighter, several keys taped together, a metal clip full of money, tightly wrapped bags of crack cocaine, or a prescription bottle.

*Id.* at 278–79 (footnotes omitted).

{19} Applying the foregoing rules to this case, we hold that the coins wrapped in tissue paper were not of such a "size or density" to provide a reasonable basis for Officer Serna's intrusion into Paul's pockets. *See People v. Mosher*, 1 Cal.3d 379, 82 Cal. Rptr. 379, 461 P.2d 659, 668 (1969) (in bank) (distinguishing an object that felt like a knife blade from "*coins*, folded papers, and many other small items ... [that] do not ordinarily feel like weapons") (emphasis added). We are aware that a roll of coins in a sock or other sling might conceivably be used as a sap, for instance, but the State does not suggest that the few coins in Paul's pocket were large enough or dense enough to be so utilized in this case. We conclude that the State has not met its burden of justifying a warrantless, expanded *Terry*-type protective search of Paul's pockets.

{20} The State insists that the fact that Officer Serna took Paul into custody provides a basis to search for atypical weapons beyond the scope of a *Terry*-type "stop and frisk." At the suppression hearing, on cross examination, Officer Serna opined that almost anything in Paul's pockets that was hard—a marble, ring, pin, or little box, for example—could be used as a weapon from Paul's position behind him in the patrol car. However, at least one other court has addressed similar arguments and reached the same conclusion that we reach today.

{21} In *Brisendine*, the California Supreme Court evaluated whether a more intrusive protective search than a pat down was warranted when two deputy sheriffs cited a group of young men for illegally camping in a national forest and escorted them on a two-hour hike partially in darkness through ravines and along deep canyon walls back to where the deputies' car was parked. *See* 531 P.2d at 1101–1104 & nn. 2, 5, 6, 8. Prior to starting the trek, after patting down the campers, one of the officers "picked up defendant's knapsack, squeezed it, determined that the outer layer was too solid to ascertain whether it contained weapons, and began a search of its compartments." *Id.* at 1102. In searching the knapsack, the deputy found "a frosted, opaque plastic bottle and a pair of envelopes," which he opened, disclosing marijuana in the former and "tablets of restricted dangerous drugs" in the latter. *Id.* at 1102, 1108.

{22} The court upheld the protective searches of the defendant's pack and its inte-

rior as reasonable to ensure the safety of the deputies, given the necessity that the campers and their effects accompany them on the return trip and the absence of any practical way for the officers to negotiate the difficult terrain and at the same time assure that their charges would not be able to gain access to weapons possibly secreted in their gear. *See id.* at 1107–08. The state attempted to justify the search of the bottle and the envelopes on the grounds that they might have contained unusual or atypical weapons, *id.* at 1108, but the court rejected the argument, relying on *People v. Collins*, 1 Cal.3d 658, 83 Cal.Rptr. 179, 463 P.2d 403 (1970).

{23} In *Collins*, the California Supreme Court made explicit the rule that "an officer who exceeds a pat-down without first discovering an object which feels reasonably like a knife, gun, or club must be able to point to specific and articulable facts which would reasonably support a suspicion that the particular suspect is armed with an atypical weapon which would feel like the object felt during the pat-down." *Id.* at 406. The *Collins* court specifically disapproved as "fanciful speculation" the reasoning of *People v. Armenta*, 268 Cal.App.2d 248, 73 Cal.Rptr. 819, 821 (1968), where the lower court upheld a search of the defendant's pocket because the soft object therein might have been a "'rubber water pistol loaded with carbolic acid.'" *Collins*, 83 Cal.Rptr. 179, 463 P.2d at 407. The California Supreme Court reaffirmed in *Brisendine*, 119 Cal.Rptr. 315, 531 P.2d at 1108, that arguments that are "fancifully theorized" by the state regarding atypical weapons are without merit, and we are persuaded that this holding is correct.

■ {24} We are aware that the California electorate has forbidden by constitutional amendment the suppression of evidence under the state's analog to the Fourth Amendment, thereby implicitly superceding the result in *Brisendine*. *See In re Lance W.*, 37 Cal.3d 873, 210 Cal.Rptr. 631, 694 P.2d 744, 750–52 (1985) (in bank) (discussing the 1982 referendum, as well the view in California that the exclusionary rule is merely a judicially-created remedy). However, as we discuss below, we decide the issue of whether

Officer Serna exceeded the bounds of a lawful *Terry*-type search under both the federal and state constitutions. Moreover, in New Mexico, unlike California, our constitution requires the suppression of evidence tainted by an unlawful search. *See Gutierrez*, 116 N.M. at 446–47, 863 P.2d at 1067–68. Hence, the logic of the California Supreme Court on the issue of the scope of protective searches remains sound and persuasive with respect to the circumstances of this case. For all of these reasons, we consider *Brisendine* to be "good law" for our purposes today.

■ {25} Subsequent to *Brisendine*, the California Supreme Court again rejected an expanded search for atypical weapons in a transportation situation, in part because the court deemed it "highly improbable, as a general proposition, that a covey of staggering and helpless inebriates like this defendant in the back of a secure B-wagon [would] design an escape plot or execute a coordinated group attack on the officers driving the van." *Maher*, 130 Cal.Rptr. 508, 550 P.2d at 1049 & n. 2. Here, in light of Officer Serna's familiarity with Paul, and the fact that Paul had never given him any reason to fear for his safety, we doubt very much that Paul would have risked the potentially severe penalties for assault or battery upon a peace officer to attack him. *See* NMSA 1978, §§ 30–22–22 through 30–22–25 (1971). As we have discussed, from an objective standpoint, nothing about Paul posed a specific, articulable threat to Officer Serna's safety. Under the principles articulated in *Terry* and its progeny, and for all of the reasons we have discussed, we hold that the search of Paul's pockets exceeded the scope of a lawful protective search under the Fourth Amendment.

■ {26} Additionally, on the facts presented here, we hold that Article II, Section 10 provides at least the same degree of protection from unreasonably intrusive pat-down searches as we have determined exists under the Fourth Amendment. *See State v. Wright*, 116 N.M. 832, 834, 867 P.2d 1214, 1216 (Ct.App.1993) (assuming generally that protection under state constitutional provision is the same or more, but not less, than under federal provision). We note that Paul preserved his state constitutional claim on this point by satisfying both prongs required

by *Gomez,* 1997–NMSC–006, ¶ 22, 122 N.M. 777, 932 P.2d 1. First, Paul argued in his motion to suppress that his rights under Article II, Section 10 were violated "in that the officer lacked … individualized suspicion that [he] was dangerous." Second, Paul developed for the children's court the factual circumstances regarding the allegedly unconstitutional pat down, eliciting, for example, Officer Serna's assertion on cross examination that virtually any small object could be used as a weapon. We also note here that because we hold that the State's grounds for an expanded protective search of Paul's pockets are lacking from an objective standpoint under both the Fourth Amendment and Article II, Section 10, we need not consider further Paul's argument that the search was pretextual.

▮▮ {27} Finally, the State appears to make a sub-argument under *Terry* and its progeny regarding the "plain feel" doctrine, which embraces soft objects. In *Dickerson,* the United States Supreme Court held that when the identity of contraband is "immediately apparent" to an officer conducting a pat-down search, the officer may lawfully seize the object. 508 U.S. at 375, 113 S.Ct. 2130. Here, the State intimates in this Court that Officer Serna was justified in emptying Paul's pockets because he felt "a soft object he believed could have been an illegal tobacco product, due to the impression of a cellophane wrapper." However, the State did not rely on the "plain feel" doctrine below to justify intrusion into Paul's pockets, nor does the State even cite *Dickerson* now on appeal. *See State v. Henderson,* 116 N.M. 541, 545, 865 P.2d 1185, 1189 (Ct.App.1993) (noting that parties may not change their argument on appeal), *aff'd,* 116 N.M. 537, 865 P.2d 1181 (1993); *see also State v. Wilson,* 117 N.M. 11, 19, 868 P.2d 656, 664 (Ct.App.1993) (recognizing that arguments not supported by authority need not be addressed). Even if we were to reach the issue of "plain feel," the fact that Officer Serna merely speculated about what the object in Paul's pocket "could have been" indicates that it was not immediately apparent to him that the object was in fact contraband. This argument is therefore unavailing.

▮▮ {28} Apart from the rubrics of a search incident to arrest and a *Terry*-type

protective search, the State's third alternative argument is that Paul consented to the search of his pockets. Searches that are shown to be consensual are an exception to the warrant requirement because they are manifestly reasonable. *See State v. Walker,* 1998–NMCA–117, ¶ 8, 125 N.M. 603, 964 P.2d 164, *cert. denied,* 126 N.M. 107, 967 P.2d 447 (1998). To be deemed valid, the consent given to search must be voluntary and not a product of duress, coercion, or other vitiating factors. *See State v. Goss,* 111 N.M. 530, 534, 807 P.2d 228, 232 (Ct.App.1991); *accord State v. Pallor,* 1996–NMCA–083, ¶ 16, 122 N.M. 232, 923 P.2d 599. The burden of proving voluntariness rests with the State and depends on "the totality of all the surrounding circumstances,' including the individual characteristics of the person who gave consent, the circumstances under which the person is detained, and the manner in which police requested the search." *Duffy,* 1998–NMSC–014, ¶ 73, 126 N.M. 132, 967 P.2d 807 (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 226–29, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Whether consent was voluntarily given is a factual question, and the trial court's determination will not be disturbed on appeal unless it is not supported by substantial evidence. *See State v. Anderson,* 107 N.M. 165, 167–68, 754 P.2d· 542, 544–45 (Ct. App.1988).

{29} The problem here is that the children's court did not base its ruling at the suppression hearing on consent, as both the State and Paul concede. Paul, citing *Aguilar v. State,* 106 N.M. 798, 751 P.2d 178 (1988), would have us determine as a matter of law that his consent was involuntary. *Aguilar,* however, is inapposite because it involved the unique jurisprudential issue of coerced confessions and a specialized, less deferential standard of review. *See id.* at 799, 751 P.2d at 179. In consent to search cases such as this one, "[i]t is for the trial court to weigh the evidence, determine the credibility of witnesses and decide if the evidence is sufficient to clearly and convincingly establish that the consent was voluntary." *Anderson,* 107 N.M. at 167–68, 754 P.2d at 544–45. Remand is therefore appropriate.

{30} In the event of remand, Paul asks this Court to develop special standards and

guidelines for the use of trial courts in evaluating juvenile consent to search cases. However, given the undeveloped state of the record on the issue of consent generally and the fact that the parties did not brief the narrower issue of juvenile consent at all below or extensively on appeal, it would be premature for us to act on Paul's request at this time, and we decline to do so. *See City of Las Cruces v. El Paso Elec. Co.*, 1998–NMSC–006, ¶ 18, 124 N.M. 640, 954 P.2d 72 ("We avoid rendering advisory opinions.").

## CONCLUSION

{31} For the reasons discussed above, we affirm the Court of Appeals' judgment that Officer Serna's initial, limited pat-down search of Paul was justified; we reverse the Court of Appeals' determination that the subsequent, expanded search of Paul's pockets was lawful, and we remand to the children's court for further proceedings regarding whether Paul's consent to search his pockets was valid.

{32} **IT IS SO ORDERED.**

MINZNER, C.J., SERNA and MAES, JJ., concur.

BACA, Justice (dissenting).

### DISSENT

BACA, Justice.

{33} I respectfully dissent from the Court's opinion. I would affirm the Court of Appeals conclusion under the Fourth Amendment the search of Paul's pockets was reasonable under the circumstances.

{34} I would hold that under a *Terry* analysis, Officer Serna's emptying of Paul's pockets did not exceed the scope of a warrantless protective search. Weapons come in all shapes and sizes. Had Officer Serna been able to discern that the solid objects he felt during the pat-down were coins, then the subsequent search of Paul's pockets would not have been justified. However, when Officer Serna could not identify the solid object, emptying Paul's pockets was proper. Indeed, the majority notes that in *United*

*States v. Oates*, 560 F.2d 45, 62 (2nd Cir. 1977), that "[i]f by touch the officer remains uncertain as to whether the article producing the bulge might be a weapon, he is entitled to remove it." Even the majority's citation of LaFave supports providing officers with some "leeway". Objects determined to be of "substantial size" have included objects such as a cigarette lighter, several keys taped together, and money in metal clips. Although it is unclear how many coins Paul had in his pocket, I would still defer to the children's court's ruling and thus I would find Officer Serna's search of Paul's pockets reasonable under the circumstances.

{35} I also write to comment on the majority's use of the interstitial approach to independently interpret our state constitution. *See State v. Gomez*, 1997–NMSC–006, 122 N.M. 777, 932 P.2d 1. When independently interpreting a state constitution whose provisions are analogous to federal constitutional provisions, the state court may consider various reasons for departing from federal constitutional interpretations. In *Gomez*, the Court outlined the following non-exclusive criteria: 1) a flawed federal analysis; 2) distinctive state characteristics; or 3) an undeveloped federal analog. *Id.* ¶¶ 19–20.[1]

{36} I believe the majority's analysis fails to properly address these or any other criteria justifying its holding that "under Article II, Section 10[, the] search of Paul's pockets cannot be considered as 'akin' to a search incident to arrest." The majority's discussion does not examine how trends in Article II Section 10 jurisprudence support the holding that a search of a minor taken into custody for a curfew violation cannot be considered akin to a search incident to arrest. The Court's reliance on cases from other jurisdictions does not provide an adequate substitute.

{37} The adoption of the interstitial approach provides this Court with a tool that "theoretically remov[es] the opportunity for the judiciaries to arbitrarily apply state constitutional provisions." Jennifer Cutcliffe Juste, *Constitutional Law—The Effect of*

---

1. In *State v. Hunt*, the New Jersey Supreme Court suggested additional reasons to justify the divergence from federal constitutional interpretation: 1) differences in textual language; 2) legislative history; 3) preexisting state law; 4) structural differences between state and federal constitutions; 5) matters of particular state interest or local concern; 6) state traditions; and 7) public attitudes. 91 N.J. 338, 450 A.2d 952, 965–967 (1982) (J. Handler, concurring).

State Constitutional Interpretation on New Mexico's Civil and Criminal Procedure— State v. Gomez, 28 N.M.L.Rev. 355, 362 (Spring 1998) (citing John W. Shaw, Comment, *Principled Interpretations of State Constitutional Law—Why Don't the "Primacy" States Practice What They Preach?*, 54 U. Pitt. L.Rev. 1019, 1025, note 17 (1993)). I believe it is the Court's duty to provide a principled basis for its interpretation of Article II, Section 10. A more comprehensive treatment would aid in the development of New Mexico's state constitutional jurisprudence, help further refine the application of the interstitial approach, and provide the bar and other jurists in New Mexico with structured guidance.

{38}  Finally, because I would hold that Officer Serna's search was reasonable, I would not reach the issue of consent and would thus affirm the conviction without a remand.