567 P.2d 496

**STATE of New Mexico, Plaintiff-Appellee,**

v.

**Kathleen RUUD, Defendant-Appellant.**

**No. 2849.**

Court of Appeals of New Mexico.

June 28, 1977.

648

J. W. Anderson, Rowley, Bowen, Anderson & Purcell, P. A., Tucumcari, for defendant-appellant.

Toney Anaya, Atty. Gen., Ernesto J. Romero, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

HENDLEY, Judge.

Convicted of unlawful possession of marijuana in an amount over eight ounces contrary to § 54–11–23(B)(3), N.M.S.A.1953 (Repl.Vol. 8, pt. 2, 1962, Supp.1975) defendant appeals asserting the trial court erred in: (1) not granting the motion to suppress; (2) the method of sentencing. The first point is dispositive. We reverse. The motion to suppress should have been granted.

### Testimony of Officer Walsmith

Walsmith of the New Mexico State Police was patrolling westbound on I–40 out of Tucumcari. Defendant was driving eastbound. Walsmith observed that defendant was a "fairly, relatively young" female, driving a "fairly new pickup" with a camper shell and an Iowa license plate. Walsmith "turned around and I stopped her to check her driver's license and registration." He wanted to see if the driver's license and the registration were from the same state. Walsmith stated that ". . . [i]n checking for stolen cars, you check the driver's license to see if it is from the same state the car was from, that sort of gives you a hint, it may not be stolen there, it's not always true, but, it helps." When asked why he thought the vehicle might be

stolen Walsmith stated: ". . . [t]he driver just looked young to me, that's the only thing that I can tell you." He did not think defendant was too young to have a driver's license. The stop was made on a "hunch." Walsmith testified when they go out looking for a "load" (marijuana) they set up a roadblock then use the driver's license and registration to look for everything and that a young driver in a pickup with a camper, with an out-of-state vehicle license plate, would be a good indication that this "might be a good vehicle to search."

Defendant produced an Arizona driver's license but could not produce the registration. Defendant told Walsmith that the vehicle belonged to a friend. Walsmith then asked for permission to look in the back of the camper. He stated the purpose was ". . . [j]ust to look, for my protection, mostly, to see if it had been stolen or anything, I wanted to make sure that she was the only subject present." Walsmith further testified that he was looking for defendant's personal belongings so that he might find the ". . . owner's name, or something on some of the luggage, or something." Defendant gave Walsmith permission and opened the back of the camper. ". . . When she opened the camper door, you could smell a very strong odor of what I thought was marijuana, and also observed marijuana residue scattered all over the floor." A search disclosed several kilos of marijuana.

*Motion to Suppress*

■ The state attempts to justify the stop on the foregoing recited facts. We cannot. We have no more here than in *State v. Galvan,* 90 N.M. 129, 560 P.2d 550 (Ct.App.1977). In *Galvan* we held that the officer must have articulable facts available, when viewed by an objective standard, to warrant a person of reasonable caution to believe the action taken is appropriate. Here there was no articulable reason to stop defendant for the purpose of investigating possible criminal behavior. Walsmith was relying on a "hunch" or "intuition."

*Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) permitted an uncontested search of an automobile without a warrant and without probable cause for arrest where the police had probable cause to believe it is carrying contraband. But as *Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) stated:

". . . the *Carroll* doctrine does not declare a field day for the police in searching automobiles. Automobile or no automobile, there must be probable cause for the search. . . ."

■ The state argues that the stop can be justified on the statutory grounds that a driver of a vehicle, shall upon demand exhibit a registration certificate and a driver's license. See §§ 64-3-11 and 64-13-49, N.M.S.A.1953 (2d Repl.Vol. 9, pt. 2, 1972). Those statutes grant the police the unquestioned good faith right to detain motor vehicles for the purpose specified. See *State v. Severance,* 108 N.H. 404, 237 A.2d 683 (1968). But any such actions must be in conformity with the constitutional requirements of the Fourth Amendment of the United States Constitution. See *Carroll v. United States,* supra. When the detention becomes an excuse for some other purpose which would not be lawful the actions then become unreasonable and fail to meet the constitutional requirement. *Murphy v. State,* 194 Tenn. 698, 254 S.W.2d 979 (1953); *Morgan v. Town of Heidelberg,* 246 Miss. 481, 150 So.2d 512 (1963); *State v. Bloom,* 90 N.M. 226, 561 P.2d 925 (Ct.App.1976) reversed on other grounds, (scope of appellate review) 90 N.M. 192, 561 P.2d 465 (1977).

■ Although *United States v. Jenkins,* 528 F.2d 713 (10th Cir. 1975) and *United States v. Lepinski,* 460 F.2d 234 (10th Cir. 1972) have interpreted the foregoing statutes to permit random stopping for registration and driver's license checks, they did so prior to any New Mexico decisions ruling on the subject. New Mexico decisions, as long as they are not violative of minimum federal constitutional standards,

are controlling. *Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). Accordingly, *Jenkins* and *Lepinski* are not controlling and are overruled insofar as they relate to the foregoing statutes.

What we hold here today does not however affect those routine roadblocks set up in good faith to check registration certificates and driver's licenses. See *State v. Bidegain,* 88 N.M. 466, 541 P.2d 971 (1975). In those instances all travelers are checked. It is a routine check and a legitimate purpose. However, the statutes do not nor cannot authorize a random selection of motorists based on a "hunch" or a "guesstimate." Such would violate minimum federal constitutional standards. *Ker v. California,* supra. The powers and duties of the State Police (§ 39–2–17, N.M.S.A.1953 (2d Repl.Vol. 6, 1972)) are rather broad and well they should be. But those powers are always controlled by constitutional standards. See *Almeida-Sanchez v. United States,* supra.

In the instant cause the facts are basically undisputed as to the reason for the stop. The facts will not support the random stop and thus will not meet the test of reasonableness under the Fourth Amendment. The facts did not provide the officer, as a person of reasonable caution, with a reasonable suspicion that the law had been or was being violated. See *State v. Galvan,* supra, and cases cited therein.

■ But the foregoing does not provide a complete answer as to whether there was a valid consent to search after the illegal stop. A voluntary consent can validate what might otherwise be an illegal search and seizure. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The only testimony (Walsmith) relating to consent is as follows:

"A. I just asked permission to look in the back.

\*    \*    \*    \*    \*    \*

"Q. What was Miss Ruud's response to that?

"A. She advised yes, and opened the back of the camper."

Without more we cannot say, as a matter of law, that it constitutes a showing of a valid consent to search within the language of *State v. Carlton,* 83 N.M. 644, 495 P.2d 1091 (Ct.App.1972):

". . . we do not hold that the *Miranda* warnings must of necessity be given before there can be a valid consent to search. See *State v. Carlton,* 82 N.M. 537, 484 P.2d 757 (Ct.App.1971). All that is required is that a consent to search 'must be freely and intelligently given, must be voluntary and not the product of duress or coercion, actual or implied, *and must be proved by clear and positive evidence with the burden of proof on the state.' State v. Aull,* 78 N.M. 607, 435 P.2d 437 (1967), cert. denied, 391 U.S. 927, 88 S.Ct. 1829, 20 L.Ed.2d 668 (1968). . . ." (Emphasis Ours)

■ When we speak of voluntary, we speak in the terms as set forth in *Schneckloth v. Bustamonte,* supra, from which we quote extensively:

"The most extensive judicial exposition of the meaning of 'voluntariness' has been developed in those cases in which the Court has had to determine the 'voluntariness' of a defendant's confession for purposes of the Fourteenth Amendment. Almost 40 years ago, in *Brown v. Mississippi,* 297 U.S. 278 [56 S.Ct. 461, 80 L.Ed. 682], the Court held that a criminal conviction based upon a confession obtained by brutality and violence was constitutionally invalid under the Due Process Clause of the Fourteenth Amendment. In some 30 different cases decided during the era that intervened between *Brown* and *Escobedo v. Illinois,* 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], The Court was faced with the necessity of determining whether in fact the confessions in issue had been 'voluntarily' given. It is to that body of case law to which we turn for initial guidance on the meaning of 'voluntariness' in the present context.

"Those cases yield no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen. 'The notion of

"voluntariness," ' Mr. Justice Frankfurter once wrote, 'is itself an amphibian.' *Culombe v. Connecticut,* 367 U.S. 568, 604–605 [81 S.Ct. 1860, 1880–1881, 6 L.Ed.2d 1037]. It cannot be taken literally to mean a 'knowing' choice. 'Except where a person is unconscious or drugged or otherwise lacks capacity for conscious choice, all incriminating statements—even those made under brutal treatment—are "voluntary" in the sense of representing a choice of alternatives. On the other hand, if "voluntariness" incorporates notions of "but-for" cause, the question should be whether the statement would have been made even absent inquiry or other official action. Under such a test, virtually no statement would be voluntary because very few people give incriminating statements in the absence of official action of some kind.' It is thus evident that neither linguistics nor epistemology will provide a ready definition of the meaning of 'voluntariness.'

"Rather, 'voluntariness' has reflected an accommodation of the complex of values implicated in police questioning of a suspect. At one end of the spectrum is the acknowledged need for police questioning as a tool for the effective enforcement of criminal laws. See *Culombe v. Connecticut, supra,* at 578–580 [81 S.Ct., at 1865–1866]. Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished. *Haynes v. Washington,* 373 U.S. 503, 515 [83 S.Ct. 1336, 1344, 10 L.Ed.2d 513]. At the other end of the spectrum is the set of values reflecting society's deeply felt belief that the criminal law cannot be used as an instrument of unfairness, and that the possibility of unfair and even brutal police tactics poses a real and serious threat to civilized notions of justice. '[I]n cases involving involuntary confessions, this Court enforces the strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will.' *Blackburn v. Alabama,* 361 U.S. 199, 206–207 [80 S.Ct. 274, 280, 4 L.Ed.2d 242]. See also *Culombe v. Connecticut, supra,* [367 U.S.] at 581–584 [81 S.Ct., at 1867–1869]; *Chambers v. Florida,* 309 U.S. 227, 235–238 [60 S.Ct. 472, 476–478, 84 L.Ed. 716].

"This Court's decisions reflect a frank recognition that the Constitution requires the sacrifice of neither security nor liberty. The Due Process Clause does not mandate that the police forgo all questioning, or that they be given carte blanche to extract what they can from a suspect. 'The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.' *Culombe v. Connecticut, supra,* 367 U.S. at 602 [81 S.Ct., at 1879].

"In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, *e. g., Haley v. Ohio,* 332 U.S. 596 [68 S.Ct. 302, 92 L.Ed. 224]; his lack of education, *e. g., Payne v. Arkansas,* 356 U.S. 560 [78 S.Ct. 844, 2 L.Ed.2d 975]; or his low intelligence, *e. g., Fikes v. Alabama,* 352 U.S. 191 [77 S.Ct. 281, 1 L.Ed.2d 246]; the lack of any advice to the accused of his constitutional rights, *e. g., Davis v. North Carolina,* 384 U.S. 737 [86 S.Ct. 1761, 16 L.Ed.2d 895]; the length of detention, *e. g., Chambers v. Florida, supra;* the repeated and prolonged nature of the questioning, *e. g., Ashcraft v. Tennessee,* 322 U.S. 143 [64

S.Ct. 921, 88 L.Ed.2d 1192]; and the use of physical punishment such as the deprivation of food or sleep, e. g., *Reck v. Pate,* 367 U.S. 433 [81 S.Ct. 1541, 6 L.Ed.2d 948]. In all of these cases, the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted. *Culombe v. Connecticut, supra* [367 U.S.] at 603 [81 S.Ct., at 1879].

"The significant fact about all of these decisions is that none of them turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances. See *Miranda v. Arizona,* 384 U.S. 436, 508 [86 S.Ct. 1602, 1645, 16 L.Ed.2d 694] (Harlan, J., dissenting); id., at 534–535 [86 S.Ct., at 1659–1660]. (White, J., dissenting). In none of them did the Court rule that the Due Process Clause required the prosecution to prove as part of its initial burden that the defendant knew he had a right to refuse to answer the questions that were put. While the state of the accused's mind, and the failure of the police to advise the accused of his rights, were certainly factors to be evaluated in assessing the 'voluntariness' of an accused's responses, they were not in and of themselves determinative. *See, e. g., Davis v. North Carolina, supra; Haynes v. Washington,* supra, [373 U.S.] at 510–511 [83 S.Ct., at 1341–1342]; *Columbe v. Connecticut,* supra, [367 U.S.] at 610 [81 S.Ct., at 1883]; *Turner v. Pennsylvania,* 338 U.S. 62, 64 [69 S.Ct. 1352, 93 L.Ed. 1810]." (Footnotes Omitted)

■ The state failed to meet its burden. Compare *Potts v. State,* 500 S.W.2d 523 (Tex.Cr.App.1973).

■ By what we say today we do not hold that a stop without reasonable suspicion that the law had been or was being violated taints all that follows. However, the voluntary nature of any consent that follows must be established by clear and positive evidence with the burden of proof on the state. *State v. Carlton,* supra. This does not mean that a person is without a remedy for an illegal stop. The civil law provides such a remedy.

Reversed and remanded.

IT IS SO ORDERED.

HERNANDEZ, J., concurs.

WOOD, C. J., concurring in part and dissenting in part.

WOOD, Chief Judge (concurring in part and dissenting in part).

Upon stopping the vehicle, the officer checked defendant's driver's license and sought to check the registration papers for the vehicle. This is undisputed. However, it is also undisputed that the reason for stopping the car was *not* for a good faith driver's license or a registration check. Rather, the stop was on the basis of the officer's "hunch" that the car was stolen. The officer arrived at this "hunch" after observing a young female driving a fairly new pickup with a camper shell and with an out-of-state license plate. These three facts do not provide a basis for an investigatory stop. See *State v. Galvan,* 90 N.M. 129, 560 P.2d 550 (Ct.App.1977).

The justification advanced for the stop is that New Mexico statutes authorize stops to check on driver's licenses and vehicle registrations. *State v. Bloom,* 90 N.M. 226, 561 P.2d 925 (Ct.App.1976), overruled on other grounds, 90 N.M. 192, 561 P.2d 465 (1977) held that such stops are constitutionally impermissible if the stop is a "subterfuge or excuse for some other purpose which would not be lawful . . . ." The uncontradicted evidence is that the stop in this case was for the purpose of following up a hunch that the vehicle was stolen. This was a pretext stop and was illegal. To this extent I agree with the majority opinion.

I disagree with the majority in holding all random stops to check driver's licenses and registration papers illegal and in purporting to overrule *United States v. Jenkins,* 528 F.2d 713 (10th Cir. 1975) and *United States v. Lepinski,* 460 F.2d 234 (10th

Cir. 1972). The stop in our case was not for the purpose of checking defendant's license or registration; thus, the validity of "random," stops need not be decided. Even if *Jenkins* and *Lepinski* are applicable, they go no further than to uphold a *good faith* stop. That is not the situation in this case.

I also disagree with the majority discussion of defendant's consent. There was no claim that her consent was involuntary. Defendant's argument to the trial court was "that this initial detention is in violation of her rights under the Fourth Amendment and everything that followed is tainted thereby." There was no reason for the State to prove a "voluntary" consent in the trial court because the validity of the consent was not attacked. The matter at issue in the trial court was the validity of the initial stop. While defendant asserted a "tainted" consent in the trial court, this "taint" was not developed in the trial court and is not argued on appeal. Whether the consent was tainted by the illegal stop is a question of fact. See *Potts v. State,* 500 S.W.2d 523 (Tex.Cr.App.1973); compare *State v. Bidegain,* 88 N.M. 466, 541 P.2d 971 (1975). No ruling of the trial court was invoked, either on "consent" or "tainted consent":

Although the initial stop was illegal, there is no basis for reversing unless the consent was invalid. Since the validity of the consent was not litigated in the trial court and since there is no "consent" ruling to review, I would affirm.