2003-NMCA-117

77 P.3d 292

**STATE of New Mexico,**
**Plaintiff–Appellee,**

v.

**Rodger PIERCE, Defendant–Appellant.**

**No. 22,918.**

Court of Appeals of New Mexico.

July 22, 2003.

Patricia A. Madrid, Attorney General, Margaret Mclean, Assistant Attorney General, Santa Fe, NM, for Appellee.

John B. Bigelow, Chief Public Defender, Jennifer Byrns, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

SUTIN, Judge.

{1} Defendant pled no contest to possession of methamphetamine and reserved the right to appeal the denial of his motion to suppress. We hold that the patdown search that revealed methamphetamine in Defendant's sock was illegal, reverse the denial of the motion to suppress, and remand for further proceedings.

## BACKGROUND

{2} In the afternoon of June 25, 2001, Officer Rohnnie Shaw of the Hobbs Police Department stopped Defendant for speeding. Shaw testified that as he approached the car, he smelled burnt marijuana. After giving his driver's license to Shaw, explaining he had no insurance, and answering all of Shaw's questions, Defendant exited the vehicle. Defendant volunteered that he had a rifle in the car. Shaw asked Defendant to step over to the curb and asked if Defendant had any weapons on him. Defendant said he had a pocketknife. Shaw twice asked Defendant to take his hands out of his pockets. Shaw testified that Defendant was "real nervous and fidgety." Officer Tom Gronewold arrived to offer back-up assistance. After smelling Defendant's car at Shaw's direction, on the videotape, Gronewold said that he smelled "dope" in the vehicle. After getting Defendant's consent, Shaw performed an initial patdown search. Shaw also testified that he smelled burnt marijuana emitting from Defendant's person. About three minutes elapsed after the end of the initial patdown, then Shaw asked what Defendant had in his front pocket, and again Defendant told him about the pocketknife. Shaw asked to see the knife "just for a minute" and told Defendant he would give it back to him.

{3} Shaw asked Defendant if he would consent to a search of the vehicle, and Defendant agreed. Shaw searched the vehicle while Gronewold stayed with Defendant, who remained nervous and fidgety, but not yet handcuffed. Gronewold stood next to Defendant, less than four feet away from Defendant. Gronewold testified that Shaw searched the front seats, front compartments, driver's and passenger's side, and the two rear seats. Shaw found no drugs in the car and testified that he suspected that drugs were on Defendant's person, or that Defendant had already ingested them. Shaw told Gronewold to pat down Defendant again. Shaw explained that he told Gronewold to do another patdown because his own patdown had not been "complete," and "[t]here was a rifle in the vehicle and for Officer Gronewold's safety." Gronewold lifted Defendant's pant leg and saw a bulge, about the size of a golf ball, in Defendant's sock.

{4} Once the bulge was seen in Defendant's sock, he was handcuffed with his hands behind his back. After being handcuffed, Defendant sat on the ground and Shaw asked him several times about the bulge. Defendant gave a number of answers denying knowledge about the bulge. Shaw said the bulge was hard and made a sound like cellophane crinkling. Shaw asked Defendant if Shaw could remove the material comprising the bulge, and Defendant said Shaw could pull it out. Shaw believed the substance inside the cellophane package was methamphetamine or some type of narcotic.

{5} Shaw videotaped the stop and the videotape was introduced as an exhibit and played for the court. The videotape shows that Shaw pulled Defendant over at approximately 13:55 and patted Defendant down at 13:59:19, which was seconds following Gronewold's arrival. Shaw began searching Defendant's vehicle at approximately 14:10:24. At approximately 14:13:46, Shaw took the rifle out of the vehicle. At 14:17:15, Shaw put the rifle back in the vehicle and at approximately 14:17:19, Shaw told Gronewold to pat Defendant down. Defendant claims that he was actually patted down three times, the second "search" occurring at 14:03:47 when Shaw asked what Defendant had in his pocket and Defendant again told Shaw that he had a pocketknife and Shaw asked to see it. How-

ever, it is unnecessary for us to determine whether there were two or three protective searches because we conclude the patdown conducted by Gronewold at the conclusion of the car search was illegal. In this opinion, we refer to the patdown that Defendant contends is illegal, the one that yielded the methamphetamine, as the second patdown.

{6} At the hearing on the motion to suppress, the court questioned the prosecutor about the basis for the second patdown. The prosecutor responded that the officers "still felt that their safety might be at issue because he was not completely patted down," that Defendant was still fidgeting, appeared nervous, and "was looking around." The prosecutor also offered that "drug dealers can be armed" and suggested this as an additional reason to support the second patdown.

{7} The court ruled that the police acted properly at every step and denied the motion to suppress. Defendant does not dispute the legality of his stop or of the initial patdown. We address only the legality of the second patdown that resulted in the discovery of methamphetamine.

## DISCUSSION

### A. Standard of Review

{8} In reviewing a trial court's ruling on a motion to suppress, we review the facts under a substantial evidence standard and apply a de novo review to the court's application of the law to the facts. *See State v. Cassola*, 2001–NMCA–072, ¶ 2, 130 N.M. 791, 32 P.3d 800.

### B. Legality of the Second Patdown

{9} Police may initiate a protective patdown search for weapons if they have " 'specific and articulable facts' " which they contend support their assessment of danger. *State v. Paul T.*, 1999–NMSC–037, ¶ 17, 128 N.M. 360, 993 P.2d 74 (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). "The search must be 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.' " *See id.* (quoting *Terry*, 392 U.S. at 26, 88 S.Ct. 1868); *State v. Ingram*, 1998–NMCA–177, ¶ 6, 126 N.M. 426,

970 P.2d 1151 (stating that a *Terry* search is allowed for the limited purpose of protecting a police officer); *State v. Flores*, 1996–NMCA–059, ¶ 17, 122 N.M. 84, 920 P.2d 1038 (stating that a *Terry* search must be "limited to its protective purpose"). A *Terry* search "may not be expanded without probable cause into a search for evidence of a crime." *Flores*, 1996–NMCA–059, ¶ 17, 122 N.M. 84, 920 P.2d 1038. If a protective search goes beyond that which is necessary to determine whether weapons are present, the fruits of the search are suppressed. *Paul T.*, 1999–NMSC–037, ¶ 17, 128 N.M. 360, 993 P.2d 74; *see also Ingram*, 1998–NMCA–177, ¶ 9, 126 N.M. 426, 970 P.2d 1151 ("Evidence which is obtained as a result of an unconstitutional search or seizure may be suppressed.").

{10} With these principles in mind we turn to the legality of the second patdown. The facts are not in dispute, so we must determine whether the law was correctly applied to the facts. *See Cassola*, 2001–NMCA–072, ¶ 2, 130 N.M. 791, 32 P.3d 800. Here, Officer Shaw initially patted down Defendant, within four minutes of pulling him over, and was satisfied with his patdown enough to leave Defendant unhandcuffed with a pocketknife in Defendant's pocket for more than three minutes. The second patdown occurred more than seventeen minutes after the initial patdown. It is significant that Shaw ordered the second patdown only after his search of the car turned up nothing, and Shaw admitted that, after he found no drugs in the car, he suspected that any drugs were on Defendant's person, or had already been ingested by Defendant. These facts belie the State's position that officer safety was the reason for the second patdown. Rather, they support the obvious conclusion that the officers performed the second patdown not out of any fear of Defendant, but simply to search for drugs on his person. That is not permitted. *See Flores*, 1996–NMCA–059, ¶ 17, 122 N.M. 84, 920 P.2d 1038.

{11} We are unpersuaded by the State's argument that the first patdown was "incomplete" and therefore the police could legitimately complete the patdown after the car had been searched. If the first patdown was

"incomplete," it was because Shaw was satisfied with the patdown, perceived no threat from Defendant, and was more interested in searching the car. It was only after the vehicle search turned up nothing that Shaw again turned his interest to searching Defendant.

{12} The State attempts to justify the second patdown by arguing that Defendant, who was "nervous and fidgety" as a result of being stopped by the police, posed a threat to the two officers. The State's attempt to portray this as a dangerous situation justifying an additional patdown is exaggerated. *See State v. Vandenberg*, 2002-NMCA-066, ¶ 22, 132 N.M. 354, 48 P.3d 92 (rejecting the notion that nervousness by itself during a traffic stop constitutes reasonable suspicion that the motorist is armed and dangerous). Defendant had been pulled over for speeding and smelled of burnt marijuana. These are not facts that justified abnormal fear on the part of the officers. At the time of the second patdown, the officers were aware of the presence of a rifle and a pocketknife, the possession of both of which Defendant voluntarily disclosed. Defendant no longer had access to those weapons. Most significantly, at the time of the second patdown, Defendant was being watched by an armed police officer who was standing "probably less than four feet" away. Given these facts, we disagree that Defendant's nervous and fidgety behavior justified an additional patdown.

{13} Moreover, although the State attempted to persuade the trial court that "drug dealers" are often armed and present a legitimate safety concern to officers, that argument is also overblown. Defendant had been speeding, allegedly traveling 41 miles per hour in a 25 mile per hour zone, had possibly been smoking marijuana, and had a rifle in the car. It does not follow that he is a drug dealer, armed, and ready to resort to force against two armed police officers, and we are unwilling to conclude that speeding, combined with the odor of marijuana and the presence of a rifle, leads to an objective concern that the driver is an armed drug dealer. *See State v. Eskridge*, 1997-NMCA-106, ¶ 26, 124 N.M. 227, 947 P.2d 502 (noting that dealing in large amounts of narcotics might allow an officer to frisk a suspect, but

possession of small amounts of marijuana would not). Further, at the time of the second patdown, no new facts discovered since the initial patdown suggested Defendant was even armed, much less an armed drug dealer who presented a tangible threat of violence against the officers.

{14} The key fact is that nothing had changed between the initial patdown and the second patdown. If anything, the danger to the officers had lessened since the initial patdown. At the time the second patdown was performed, the danger to the officers appeared to be minimal, and we reject the State's argument that the second patdown was motivated by a legitimate concern for officer safety. Rather, the motivation behind the subsequent search was to conduct a fishing expedition to look for evidence of a crime. That is not the purpose of a protective search and is not permitted. *See Flores*, 1996-NMCA-059, ¶ 17, 122 N.M. 84, 920 P.2d 1038.

■ {15} The State argues that the officers' subjective fear of weapons was accepted by the trial court, and suggests that we should defer to the court's determination of credibility. We reject this argument. First, the officers' subjective belief is not the test. Rather, the applicable standard is an objective standard that asks whether a reasonably prudent person under the same circumstances would have believed that his safety or that of others was at risk. *See Paul T.*, 1999-NMSC-037, ¶¶ 16, 18, 128 N.M. 360, 993 P.2d 74. If the test were subjective, any officer could avoid the constitutional requirement of reasonableness and have unfettered leeway to perform a patdown, simply by testifying that he feared for his safety. The expansive nature of the position offered by the State is evident here, where Officer Shaw testified that, "[t]here's always an apprehension of another weapon." Taken to its logical conclusion, the State's position would always allow police to conduct a series of patdowns because, in theory, there is always fear that a prior patdown was not complete and another weapon might surface.

{16} Second, the facts in this case are not disputed and the comments of the trial court do not appear to indicate that the court ruled for the State because it found the police credible. Rather, the general comments of

the court indicate that the court believed the officers "conducted themselves properly," which suggests the court concluded that the second patdown was justified and met the applicable legal standard. The court's application of the law to the facts is not entitled to any deference on de novo review. *See Cassola*, 2001–NMCA–072, ¶ 2, 130 N.M. 791, 32 P.3d 800.

{17} The State also argues that we should defer to the officers' decision to conduct a second patdown because police officers have experience and specialized training "to make inferences from and deductions about the cumulative information available to them" that might elude an untrained person. We agree that, in appropriate circumstances, experience and specialized training might require deference to the observations of police. *See People v. F.J.*, 315 Ill.App.3d 1053, 248 Ill.Dec. 716, 734 N.E.2d 1007, 1011 (2000) (stating that an officer must explain how the officer's training and experience enabled him to attribute special significance in facts that would seem innocent to a layperson). However, the State has not pointed to anything in this case that, interpreted through the lens of specialized knowledge of the police, would have special significance. Nor is there any explanation by either trained officer about anything that would indicate a secret meaning or an increased threat. Without such specific evidence, deference to the officers' decision to conduct a second patdown is unwarranted.

{18} We recognize that police face serious danger from weapons and have a legitimate fear of potentially armed suspects, but, in most cases, the ability of the police to frisk people must be limited to an initial protective search. We see nothing in this record to support a reasonable belief that sufficient danger was present to support a second patdown. Gronewold did not testify that he conducted the second patdown out of concern for his safety. Nor are we persuaded that this is simply a matter of accepting the credibility of Shaw who testified that he was concerned for his safety and Gronewold's safety, or that the court's decision to accept his testimony is entitled to deference. De novo review requires that we determine whether a particular set of facts meets the constitutional standard for a patdown. *See*

*State v. Attaway*, 117 N.M. 141, 144–45, 153, 870 P.2d 103, 106–07, 115 (1994). Having done so, we determine that, on these facts, the State did not meet that standard.

## C. Consent

{19} The State argues that Defendant consented to the search when he told Officer Shaw to pull the material out of his sock. *See Paul T.*, 1999–NMSC–037, ¶ 28, 128 N.M. 360, 993 P.2d 74 (stating that consent is an exception to the warrant requirement). "To be deemed valid, the consent given to search must be voluntary and not a product of duress, coercion, or other vitiating factors." *See id.* The trial court's determination on the voluntariness of consent is a factual question reviewed to see if it is supported by substantial evidence. *See id.* We review the evidence in the light most favorable to the trial court's finding. *See State v. Mann*, 103 N.M. 660, 665, 712 P.2d 6, 11 (Ct.App.1985).

{20} The State bears the burden of proving voluntariness, which depends on the totality of the circumstances. *See Paul T.*, 1999–NMSC–037, ¶ 28, 128 N.M. 360, 993 P.2d 74. Factors considered are the individual characteristics of the defendant, the circumstances of the detention, and the manner in which the police requested consent. *See id.* The voluntariness of consent "involves a three-tiered analysis: (1) there must be clear and positive testimony that the consent was specific and unequivocal; (2) the consent must be given without duress or coercion; and (3) the first two factors are to be viewed in light of the presumption that disfavors the waiver of constitutional rights." *See State v. Anderson*, 107 N.M. 165, 167, 754 P.2d 542, 544 (Ct.App.1988). In determining whether the consent to search was coerced or made under duress, our case law has looked to analogous case law on coerced confessions. *See State v. Chapman*, 1999–NMCA–106, ¶ 21, 127 N.M. 721, 986 P.2d 1122. Ultimately, the essential inquiry is whether Defendant's will had been overborne. *See State v. Ruud*, 90 N.M. 647, 651, 567 P.2d 496, 500 (Ct.App.1977).

{21} At the time he gave consent to the two police officers who were standing over him, the officers had detained him for

over twenty minutes, subjected him to one search of his person, asked him to turn over his pocketknife, searched his car, and forced him to sit on the curb with his hands cuffed behind his back. Shaw "repeatedly" asked Defendant what the bulge was and continued to press Defendant for information after Defendant gave answers in which he declined to incriminate himself. Eventually, Defendant capitulated to Shaw's request to remove the material comprising the bulge. Viewed in light of the presumption that disfavors the waiver of constitutional rights, we are unwilling to accept that Defendant's permission to remove the material in his sock was free from coercion and duress. *See Anderson,* 107 N.M. at 167, 754 P.2d at 544 (stating that consent analysis is to be viewed in light of the presumption that disfavors the waiver of constitutional rights). We conclude that there was not "clear and positive" evidence that Defendant's consent was voluntary. *See Ruud,* 90 N.M. at 652, 567 P.2d at 501.

### D. Plain–Feel Doctrine

{22} The State suggests that the plain-feel doctrine justifies the seizure of the methamphetamine. We have not formally applied the plain-feel doctrine in New Mexico. *See Paul T.,* 1999–NMSC–037, ¶ 27, 128 N.M. 360, 993 P.2d 74 (recognizing the United States Supreme Court's adoption of the doctrine but holding that it was not preserved and, even if it had been, would not apply to the facts in that case). Even were we inclined to adopt and apply the plain-feel doctrine in the present case, it is obvious that a lawful patdown is a prerequisite for the application of that doctrine. *See id.* Because the second patdown was unlawful, the State cannot rely on the plain-feel doctrine.

### CONCLUSION

{23} We reverse the denial of the suppression motion and remand for further proceedings.

{24} **IT IS SO ORDERED.**

WE CONCUR: CYNTHIA A. FRY and MICHAEL VIGIL, Judges.