**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2010-NMCA-045**

**Filing Date: April 16, 2010**

**Docket No. 28,198**

**STATE OF NEW MEXICO,**

   **Plaintiff-Appellee,**

**v.**

**WILLIAM JOHNSON,**

   **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**John A. Dean, Jr., District Judge**

Gary K. King, Attorney General
Andrea Sassa, Assistant Attorney General
Santa Fe, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Corey J. Thompson, Assistant Appellate Defender
Carlos Ruiz de la Torre, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**OPINION**

**SUTIN, Judge.**

{1}     This search and seizure case results from a 911 call in which the caller reported criminal activity involving the firing of weapons from two vehicles. Officers were dispatched to the area of the reported activity. The issues raised involve whether the officers had lawful bases on which to initiate an investigation, to approach a parked vehicle thought to be involved in the activity in the manner they did with weapons drawn, to seize Defendant who was a passenger in the vehicle, to conduct a *Terry* patdown, and to seize a glass pipe

1

and then arrest Defendant for possession of the pipe. *See generally Terry v. Ohio*, 392 U.S. 1 (1968).

**{2}** Defendant William Johnson seeks to overturn his conviction on the grounds that the officers had no legal justification for any of these actions that ultimately led to his arrest for possession of drug paraphernalia. We hold that the officers acted lawfully up to the point when one of the officers seized the pipe. However, we hold that the officer did not have justification to seize the pipe because the officer impermissibly went beyond the lawful parameters of a *Terry* patdown for weapons. When the officer first felt the object later determined to be a glass pipe, it was immediately apparent to the officer that the object was not a weapon, and the officer nevertheless continued to manipulate the object and ultimately determined it was contraband. We therefore reverse Defendant's conviction.

## BACKGROUND

**{3}** Police dispatch received a call from a person reporting criminal activity in the close vicinity of the caller's home. We begin with a summary of the facts related to the call to dispatch and the follow-up activities. We then turn to the points Defendant raises on appeal. In the discussion portion of the opinion, we set out further facts in the context of those points.

### The Call to Dispatch

**{4}** Police dispatch received the following call:

> **Caller**: I live on South First Street in Bloomfield across from the soccer field. There was just two trucks in the parking lot between the soccer field and the baseball field and my daughter was just leaving. I thought I heard a gunshot. It looked like the two vehicles were going back behind . . . I think . . . I don't know what street that is down there, that goes out there, but I think there was . . . one was a smaller kind of orangish ugly truck, and the other was a big truck like maybe a 70[s] or 80[s] Chevy or Ford pickup. They're chasing each other around here and they are shooting at each other.

After the dispatch asked what color the Chevrolet was, the caller stated:

> **Caller**: It was . . . I think it was . . . I got in real quick I didn't want them shooting me. [It] looked to me like it was part orange and part cream colored. . . . And I definitely heard a gunshot and I see a lot of drug activity back here. But I don't want them coming after me, so I'd appreciate it if you didn't let my name out.

The dispatch operator asked if it was the parking lot of the soccer field, and the caller answered, "Right.  There's a parking lot between the soccer field and the ball field.  And I heard the gun fire there[.]"  The caller continued, again confirming that the two trucks were in the vicinity of the soccer field near her home and noting that her specific location was on "[First] Street . . . across from the soccer field."

**The Dispatch Communication With Officer Scott**

**{5}**     Dispatch informed Officer Scott that there was a "shots-fired" call involving two vehicles on south First Street driving in circles shooting at each other.  The dispatcher also described the vehicles to Officer Scott as being a smaller orange truck and an older model Chevrolet truck.  Dispatch informed him that the trucks were last seen chasing each other eastbound from Bluffview from First, and that the reporting party believed that the person who owned the orange truck may live on south Turner Street.

**STANDARD OF REVIEW**

**{6}**     "We view the facts in a manner most favorable to the prevailing party and defer to the district court's findings of fact if substantial evidence exists to support those findings." *State v. Urioste*, 2002-NMSC-023, ¶ 6, 132 N.M. 592, 52 P.3d 964.  "All reasonable inferences in support of the district court's decision will be indulged in, and all inferences or evidence to the contrary will be disregarded." *State v. Jason L.*, 2000-NMSC-018, ¶ 10, 129 N.M. 119, 2 P.3d 856 (alterations omitted) (internal quotation marks and citation omitted).  When a seizure occurred, and whether it was based on reasonable suspicion, involve mixed questions of fact and law which we review de novo.  *See Urioste*, 2002-NMSC-023, ¶ 6 (indicating that search and seizure issues and determinations of reasonable suspicion are mixed questions of fact and law that should be reviewed de novo).

**DISCUSSION**

**Whether the Call and the Dispatch Communication Justified Officer Scott's Investigative Activities and Patdown**

**{7}**     Defendant raises two issues on appeal to support his contention that the officer did not have sufficient evidence to conduct the investigation and to seize Defendant and then conduct a patdown and, therefore, that the seizure of the glass pipe should be suppressed as being the fruit of an unreasonable search and seizure.  First, he asserts that Officer Scott did not possess sufficient information to justify his seizure of Defendant.  The underlying reasons for this assertion are summarized by Defendant as follows:

> [T]here were no specific, articulable facts given to the officer and the informant was not a known, reliable source of information.  Moreover, the officer could not independently confirm anything the anonymous informant told dispatch, other than the mere location and vague description of the vehicles involved.  Officer Scott did not receive any information from dispatch or from the anonymous informant about the facts giving rise to the

3

suspicion that the people in the described vehicles were actually shooting guns. [Defendant] did not commit any traffic or moving violations, and Officer Scott's initial seizure was based solely on the dispatch report. The officer was responding to the *conclusion* rendered by dispatch that the drivers of the described vehicles were suspected of gunfire, and he was not acting on any specific, articulated facts that would give rise to reasonable suspicion.

(Footnote omitted.) At oral argument, Defendant added that the officers had insufficient information to approach the vehicle where Defendant was sitting with guns drawn.

**{8}** Second, Defendant asserts that Officer Scott did not articulate specific safety concerns to support his *Terry* patdown of Defendant. Defendant argues that the State failed to demonstrate specific, articulable facts that, when judged objectively, would lead a reasonable person to believe that criminal activity was occurring and further failed to demonstrate that the officer had the specific and articulable safety concerns that would justify the patdown. *See State v. Gerald B.*, 2006-NMCA-022, ¶ 16, 139 N.M. 113, 129 P.3d 149 (indicating that to justify a frisk for weapons, the officer must provide more than just conclusive characterizations of the defendant's behavior and demeanor); *State v. Boblick*, 2004-NMCA-078, ¶ 12, 135 N.M. 754, 93 P.3d 775 (indicating that, in a weapons frisk, in striking the balance between individual rights and public interest in maintaining officer safety, "the concern for officer safety must have some basis in the circumstances at hand" and that the weapons frisk can be "justified only if the officers had some specific, articulable safety concerns"); *State v. Pierce*, 2003-NMCA-117, ¶ 9, 134 N.M. 388, 77 P.3d 292 (indicating that, to initiate a protective search, the officer must have specific and articulable facts on which to premise the assessment of danger). According to Defendant, the only evidence presented by the State was Officer Scott's generalized suspicion based on a subjective perception that Defendant was "anti-police." The officer had no prior dealings with Defendant involving a weapon, and Defendant did not have a reputation for having a weapon. Further, Defendant argues that the officers were responding to nothing more than an anonymous, unreliable, and uncorroborated source who reported hearing gunshots, but they lacked information that a serious crime was occurring or that Defendant was armed and dangerous. In Defendant's view, the patdown was nothing more than an automatic protective frisk lacking exigent circumstances and forbidden under *State v. Vandenberg*, 2003-NMSC-030, ¶ 32, 134 N.M. 566, 81 P.3d 19, which states that "[i]t is only when the traffic stop ceases to be routine that a weapons frisk *may* be necessary, assuming that the officer can meet the exacting burden of presenting exigent circumstances, in sufficient detail and with convincing sincerity."

**{9}** We reject Defendant's arguments. The call was sufficiently reliable to justify the officer's initial investigative activities. The caller gave her residence location, which was across from the area where the reported activity was occurring. The caller was clearly very concerned about the dangerous activity in her neighborhood and about being identified by name because someone might cause her harm for reporting the incident. The caller described seeing and hearing what she believed to be criminal activity as it was occurring. It was not a description of predicative information of a possible future crime. The caller remained anonymous because she feared reprisal.

4

**{10}** Moreover, Officer Scott received a "priority call" from dispatch stating that shots were fired. The officer received descriptions of the two vehicles involved and their location. Further, dispatch not only told Officer Scott that the smaller orange truck "may live on south Turner," but also that the driver of the smaller orange truck left his vehicle and had gotten into the older model Chevrolet, and it headed north on First Street. It is significant that Officer Scott knew right away that Defendant drove a vehicle similar to one the dispatcher had described and "lived in that general area of town." Officer Scott discovered an older model Chevrolet parked in the parking lot attached to the baseball field, adjacent to a park and, upon approaching the vehicle, he found Defendant sitting in the passenger seat of that vehicle.

**{11}** The foregoing building blocks of Officer Scott's knowledge and discoveries corroborate aspects of the information given by the caller. We are persuaded that the information given by the caller and the caller's demeanor sufficiently indicated that the caller was credible, and we are also persuaded that the information she imparted was credible and reliable. Therefore, the officers had a lawful basis on which to initiate their investigation of the shooting of weapons from specifically described vehicles in the reported area.

**{12}** Officer Scott testified as follows in regard to his initial investigative activity. Upon seeing a vehicle matching the description of the Chevrolet truck in a parking lot near the area of the call and noticing that it was the only vehicle in the parking lot, Officer Scott left his marked patrol car and approached the passenger side of the truck. The other officer approached the driver's side. Officer Scott was concerned about "furtive movements"[1] by the passenger in the truck because he was investigating the report that shots had been fired at this location. The officer described the furtive movements as "just movement—I could see shadows where hands were or heads, that kind of thing, just a lot of movement for somebody who was being contacted by police." Officer Scott did not know if there was a weapon in the vehicle and did not know why the occupants would be moving as they were.

---

[1] In regard to a generalization of "furtive movements," we think it appropriate to quote Judge Posner's comments in *United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005):

> Gilding the lily, the officer testified that he was additionally suspicious because when he drove by [the defendant] in his squad car before turning around and getting out and accosting him he noticed that [the defendant] was staring straight ahead. Had [the defendant] instead glanced around him, the officer would doubtless have testified that [the defendant] seemed nervous or, the preferred term because of its vagueness, "furtive." Whether you stand still or move, drive above, below, or at the speed limit, you will be described by the police as acting suspiciously should they wish to stop or arrest you. Such subjective, promiscuous appeals to an ineffable intuition should not be credited.

(Alteration omitted) (internal quotation marks omitted).

5

He was concerned that the vehicle's occupants might be trying to hide a weapon. For these reasons, the officers approached the vehicle with their handguns held in a "low-ready" position. Officer Scott could reasonably believe that the Chevrolet he saw parked was the truck described as being involved in the reported activity. It was also reasonable for the officers to approach the truck as they did and to see who was inside. We hold that the foregoing activity did not amount to a seizure of Defendant.

**{13}** At the vehicle, Officer Scott recognized that Defendant was the person sitting in the passenger seat, and the officer's investigative activity quickly evolved into an investigative detention or a seizure. Officer Scott knew from prior dealings with Defendant that Defendant was aggressive and "not very friendly toward[] police," and "anti-police." For safety reasons, Officer Scott told Defendant to keep his hands visible and to exit the truck, and he told Defendant that the officers were investigating a shots-fired call. In response, Defendant told Officer Scott that his truck had backfired. We hold that Officer Scott provided articulable, reasonable suspicion that Defendant had been engaged in criminal activity. We further hold that Officer Scott then had a reasonable and justifiable belief that Defendant could be armed and was presently dangerous to the officer, sufficient to support his commands that Defendant keep his hands visible and exit the truck and to support the officer's ensuing patdown. *See Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (discussing the *Terry* holdings to this effect).

**The Seizure of Drug Paraphernalia**

**{14}** On direct examination, Officer Scott testified that during the patdown he felt a hard object in Defendant's right jacket pocket. This testimony followed:

| | |
|---|---|
| State: | Okay. And did you determine what that was? |
| Officer: | From my training and experience, I believed it to be a glass pipe that is commonly used for the ingestion of methamphetamine. |
| State: | And at what point did you make that determination? I mean could you tell by feeling it? |
| Officer: | Yes, Ma'am. |
| | . . . . |
| State: | Okay. So after you found the hard object in the pocket that you believed to be a pipe, what did you do then? |
| Officer: | I placed [Defendant] in cuffs. |

The questioning on cross-examination went as follows:

Defense:     Okay. So, when you . . . first touched the pipe, did you immediately recognize what it was.

Officer:     Um, fairly quickly, yes sir.

Defense:     When you first touched the pipe, you didn't know what it was though, the very first time you touched it?

Officer:     The first time I touched the pipe, I felt a hard object.

Defense:     Okay. . . . At that point in time, when you touched that hard object, you did not know that it was a drug pipe or a meth pipe, right?

Officer:      The first time I touched it, no sir.

Defense:     Alright. And so in fact you had to touch it on several other times, correct, to make a determination by you that it was a drug pipe, correct?

Officer:     To make a determination that it was not a weapon.

Defense:     That it was not a weapon, right?

Officer:     Yes, sir.

Defense:     But after you touched it and manipulated that pipe a little bit, you determined that it was some sort of glass pipe right?

Officer:     Yes, sir.

**{15}**    Defendant argues that Officer Scott's seizure of the pipe was not justified. He first asserts that a *Terry* protective search is to be limited to what is necessary to discover weapons and is not for the purpose of discovering evidence of a crime. *See Sibron v. New York*, 392 U.S. 40, 65-66 (1968) (holding that a protective search under *Terry* is not to discover evidence of a crime but to do what is necessary to discover weapons for safety purposes); *Pierce*, 2003-NMCA-117, ¶ 9 ("If a protective search goes beyond that which is necessary to determine whether weapons are present, the fruits of the search are suppressed."). He further asserts that the seizure was not justified under the plain-feel doctrine. *See Dickerson*, 508 U.S. at 375-76 (stating the federal rule that is known as the plain-feel doctrine, which is that an officer may legally seize a concealed object during a patdown if the identity of the object as illegal contraband is "immediately apparent" to the officer). He bases this assertion on the fact that "there is no doubt that Officer Scott had to manipulate the object to make a determination that it was a pipe used to ingest drugs." *See id.* at 378.

**{16}** Defendant argues further that "merely feeling a glass pipe in a pocket does not make the illegality of the object immediately apparent without a further search of the object," and that the object here, a pipe, could have been used for a legal purpose. *Cf. State v. Sanchez*, 2005-NMCA-081, ¶ 18, 137 N.M. 759, 114 P.3d 1075 (indicating that if the evidence seized from a pocket had not been contraband but had "instead been lawful objects suspected of being connected with a crime, a different result might obtain"). However, apparently as an alternative argument, although Defendant introduces it as "[a]dditionally," Defendant points out that "New Mexico remains a state that has not explicitly accepted the [plain-feel] doctrine," and he argues that this Court should, therefore, reject the plain-feel doctrine. *See State v. Paul T.*, 1999-NMSC-037, ¶ 27, 128 N.M. 360, 993 P.2d 74 (refusing to reach the issue of "plain feel" under the *Dickerson* plain-feel doctrine raised for the first time on appeal); *Pierce*, 2003-NMCA-117, ¶ 22 (referencing *Paul T.* and in response to the prosecution's suggestion that the plain-feel doctrine justified the seizure of contraband, the Court stated that it had not "formally applied the plain-feel doctrine in New Mexico").

**{17}** Getting beyond the somewhat ambiguous approach Defendant has taken, Defendant essentially maintains that to permit the officer to explore the nature or identity of the object through manipulation in order to determine if it was a drug pipe is to move significantly beyond the parameters of a lawful *Terry* patdown or of a permissible plain-feel based seizure.

**{18}** In its answer brief, the State points to Officer Scott's testimony that, based on his training and experience, "it was immediately apparent to him that the pipe was of the type commonly used to ingest methamphetamine." By footnote, citing *Sanchez*, 2005-NMCA-081, ¶ 18, the State argues that "[t]he discovery and seizure of the glass pipe is lawful in New Mexico irrespective of this Court's application of the plain-feel doctrine" because no additional exigency was necessary for seizure of contraband.

**{19}** The State maintains that the seizure of the pipe during the *Terry* search was lawful under *Sanchez* on the ground that a person does not have a privacy interest in contraband. At the suppression hearing in *Sanchez*, the defendant argued only that the New Mexico Constitution required proof of exigent circumstances before seizure without a warrant and that exigent circumstances were not present. *Id.* ¶ 7. On appeal, apparently based on the defendant's assumption that New Mexico had adopted the plain-feel doctrine, the Court pointed out that the defendant was not asserting a Fourth Amendment violation and could not therefore rely on the plain-feel doctrine but, instead, was contending only that his rights were violated under article II, section 10 of the New Mexico Constitution because the prosecution failed to show that there were exigent circumstances to justify the seizure of the pocket contents. *Sanchez*, 2005-NMCA-081, ¶¶ 8, 16. The Court, therefore, did not address the Fourth Amendment or the plain-feel doctrine, and it proceeded to address only the asserted violation of the New Mexico Constitution based on lack of exigent circumstances to justify the warrantless seizure. *Id.*

**{20}** The Court in *Sanchez* determined that the defendant's argument had taken the wrong path. The Court centered on "the different values that constitutional provisions like the Fourth Amendment and [a]rticle II, [s]ection 10, are designed to protect." *Sanchez*, 2005-

8

NMCA-081, ¶ 17. Taking that tack, the Court moved into what the search and seizure aspects of these provisions were intended to protect, and the Court stated that "[t]he search aspect of these provisions protects expectations of privacy, while the seizure aspect protects notions of possession, at least insofar as it applies to objects." *Id*. Following that line of analysis, the Court indicated that it had already determined that the defendant's detention and patdown were lawful and that the defendant had not challenged the officer's immediate identification of the cocaine. *Id*. ¶ 18. The Court then reasoned that the privacy threshold had already been lawfully breached at the time the officer identified the cocaine during the patdown and, therefore, the only remaining value to be protected under article II, section 10, was the defendant's interest in possessing cocaine. *Sanchez*, 2005-NMCA-081, ¶ 18. With that narrowing of the issue, the Court proceeded to hold that the defendant had no interest in possessing cocaine, and therefore, "once [the officer] knew [the d]efendant had rocks of cocaine in his pocket, there was no need for exigent circumstances to allow their seizure without a warrant." *Id*.

**{21}** We do not read *Sanchez* as limiting relief in the present case. In *Sanchez*, the defendant did not seek protection under the federal plain-feel doctrine and did not seek similar but greater protection under the New Mexico Constitution based on a proper challenge to the initial discovery of the contraband. *Id.* (indicating that the defendant did not challenge the officer's immediate identification of the contraband and that, therefore, the privacy threshold as to the discovery of the cocaine had already been lawfully breached). Furthermore, *Sanchez* addressed only the issue of exigent circumstances.

**{22}** We are persuaded that under the particular facts in the present case, the officer did, indeed, overstep his lawful *Terry* pursuits and any permissible, plain-feel based seizure. In these cases involving seizure of nonthreatening contraband during a protective *Terry* patdown search, it is important to keep very much in mind the roots of the *Terry* protection. We quote a succinct statement in that regard from *Dickerson*, 508 U.S. at 372-73:

> The Fourth Amendment . . . guarantees the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. Time and again, this Court has observed that searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment[]subject only to a few specifically established and well delineated exceptions. One such exception was recognized in *Terry* which held that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot . . ., the officer may briefly stop the suspicious person and make reasonable inquiries aimed at confirming or dispelling his suspicions.

> *Terry* further held that when an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, the officer may conduct a patdown search to determine whether the person is in fact carrying a weapon. The purpose of this limited search is not to discover evidence of

9

crime, but to allow the officer to pursue his investigation without fear of violence. . . . Rather, a protective search—permitted without a warrant and on the basis of reasonable suspicion less than probable cause—must be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby. If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed.

(Alterations omitted) (third and fourth omissions in original) (internal quotation marks and citations omitted). In *Dickerson*, the Supreme Court discussed its cases that permitted officers to seize contraband under the plain-view doctrine. *Id*. at 374-75. Through analogy, the Court likened "tactile discoveries of contraband," to plain view of contraband, the Court stated:

If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.

*Id*. at 375-76. Herein lies the doctrine applicable in the present case.

**{23}**    In regard to the concern of intrusion into privacy, the Court in *Dickerson* stated further that "[t]he seizure of an item whose identity is already known occasions no further invasion of privacy. Accordingly, the suspect's privacy interests are not advanced by a categorical rule barring the seizure of contraband plainly detected through the sense of touch." *Id*. at 377 (citations omitted). However, applying the foregoing legal analyses to the case before it, the Court in *Dickerson* held that the officer who conducted the search acted outside of and overstepped the lawful "bounds of the strictly circumscribed search for weapons allowed under *Terry*," because the officer "determined that the lump was contraband only after squeezing, sliding and otherwise manipulating the contents of the defendant's pocket—a pocket which the officer already knew contained no weapon." *Id.* at 378 (internal quotation marks and citation omitted).

**{24}**    In our view, if, while conducting a *Terry* patdown for a weapon, an officer feels an object and the officer is able to articulate reasons why it was immediately apparent to the officer at first feel, without further exploration or manipulation, that the object was contraband, his seizure of the contraband will be justified. However, when, as here, the officer knows or should know on first feel that the object is not a weapon, and at the same time it is not immediately apparent that the object is contraband, we see no reason to permit an officer conducting a *Terry* patdown to engage in continued exploration and manipulation of the object for the purposes of attempting to determine its nature as contraband.

**{25}**    Although perhaps more difficult in its application, the plain-feel concept is likened to the plain-view doctrine that permits officers to seize contraband in plain view during a

10

home sweep for protective purposes. *See Dickerson*, 508 U.S. at 374-75. Once an officer starts searching for contraband that is not in plain view during a protective sweep, the search and any seizure move beyond the lawful parameters of the home-sweep doctrine. In the present case, the officer moved beyond the lawful parameters of a *Terry* patdown, and the seizure was not permissible under the plain-feel doctrine. The officer's continued exploration or manipulation of the object was unreasonable given the lack of any lawful basis on which to seize the object without a warrant. As a result, the pipe was the fruit of an illegal search, and Defendant's motion to suppress should have been granted.

**The Issue of Arrest Without Probable Cause**

{26} Because we reverse the denial of Defendant's suppression motion based on an unlawful seizure of the pipe, we do not address whether Defendant's investigatory detention became a de facto arrest requiring probable cause and whether Defendant was therefore arrested without probable cause.

**CONCLUSION**

{27} We reverse the district court's denial of Defendant's motion to suppress. The motion should have been granted and the pipe, which was the subject of the motion, and evidence of its possession should have been suppressed.

{28} **IT IS SO ORDERED.**

_____
**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____
**CELIA FOY CASTILLO, Judge**

_____
**LINDA M. VANZI, Judge**

**Topic Index for *State v. Johnson*, Docket No. 28,198**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-SR | Standard of Review |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-CL | Controlled Substances |
| CL-ST | Shooting Offences |
| | |
| **CT** | **CONSTITUTIONAL LAW** |
| CT-FA | Fourth Amendment |

11

**CA**                        **CRIMINAL PROCEDURE**

| | |
|---|---|
| CA-SZ | Search and Seizure |
| CA-SR | Search Incident to Arrest |
| CA-WA | Warrantless Arrest |
| CA-WS | Warrantless Search |